[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-13358

_____

D.C. Docket Nos. 1:15-cv-00611-KD,
1:14-cr-00290-KD-C-1

DENZIL EARL MCKATHAN,

Petitioner - Appellant,

versus

UNITED STATES OF AMERICA,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(August 12, 2020)

Before ROSENBAUM, BRANCH, and DUBINA, Circuit Judges.

ROSENBAUM, Circuit Judge:

Darned if you do and darned if you don't.  That dilemma is nothing new.

Indeed, around 800 B.C.E., Homer wrote of the problem in his epic poem *The*

*Odyssey.*   There, the conundrum appeared when Odysseus found himself "caught between the Scylla and Charybdis," a phrase we continue to use today to refer to the darned-if-you-and-darned-if-you-don't scenario.[1]

The Supreme Court has also coined a catchphrase for a particular version of this dilemma: "classic penalty situation." *Minnesota v. Murphy*, 465 U.S. 420, 435 (1984).   A "classic penalty situation" arises when a person must choose between incriminating himself, on the one hand, or suffering government-threatened punishment for invoking his Fifth Amendment privilege to remain silent, on the other. *See id.*

But the Supreme Court has also identified a solution to this problem:  when a "classic penalty situation" occurs, the Fifth Amendment privilege is self-executing, and the government is deemed to have compelled the speaker's statements in

---

[1] The phrase refers to two extremely perilous (mythical) hazards that Odysseus, on his way home from the Trojan War, encountered when he had to navigate the narrow Strait of Messina (separating what are now known as the island of Sicily and the so-called "toe" of the Italian peninsula).  The Strait was sandwiched between the Scylla and Charybdis.  The Scylla was a six-headed monster who, from a cliff on one side of the Strait, reached out into the Strait and snatched up and devoured sailors.  And the Charybdis was a whirlpool that sank ships that sailed too close on the other side of the Strait, trying to avoid the Scylla.  Odysseus knew he was darned if he sailed closer to the Scylla and darned if he didn't and instead passed through the Strait closer to the Charybdis.  In the end, Odysseus gambled on sailing closer to the Scylla, betting she would eat only a few of his sailors, since he feared the Charybdis's vortex might take his whole ship.  Though Odysseus survived the Strait, he lost some sailors to the Scylla.  Homer, *The Odyssey* (Robert Fitzgerald trans., Farrar, Strauss and Giroux 1998) (1961).  The expression "caught between the Scylla and Charybdis," has such force that thousands of years later, we continue to employ it to refer to the dilemma of being darned if you do and darned if you don't. *See*, *e.g.*, The Police, *Wrapped Around Your Finger*, *on* SYNCHRONICITY (A&M Records 1983) ("You consider me a young apprentice, caught between the Scylla and Charybdis:  hypnotized by you if I should linger, staring at the ring around your finger").

violation of the Fifth Amendment. *See id.* As a result, the statements are rendered inadmissible in a criminal prosecution. *See id.*

Petitioner-Appellant Denzil McKathan's habeas petition raises the question of whether, while on supervised release, McKathan faced a "classic penalty situation" when his probation officer asked him to answer questions that would reveal he had committed new crimes. For reasons we explain below, we conclude that he did.

McKathan's attorneys never raised this argument during his criminal proceedings on the newly revealed crimes. Had they done so and on that basis filed a motion to suppress the statements McKathan made and the evidence the government derived from those statements, the government would have had to establish that it nonetheless would have obtained the incriminating evidence against McKathan through other, lawful means. If the government had been unable to do so, it is reasonably likely that McKathan would have prevailed on his suppression motion, and the outcome of McKathan's case would have been different. As a result, McKathan would be entitled to habeas relief upon a showing that his counsel's performance was deficient in failing to raise this argument. But because the current record lacks information concerning whether the evidence derived from McKathan's statements otherwise would have been admissible, we vacate the district court's

denial of McKathan's 28 U.S.C. § 2255 motion and remand for further proceedings consistent with this opinion.

## I.

To understand the issue in this case, we must review the facts of four events: (1) McKathan's 2005 conviction for possession of child pornography; (2) McKathan's 2014 violation of his supervised-release term that was imposed as a result of his 2005 conviction; (3) McKathan's 2014 conviction for receipt of child pornography; and (4) McKathan's 28 U.S.C. § 2255 motion to set aside his 2014 conviction for receipt of child pornography.  Below, we review the facts of each of these events.

### A. McKathan's 2005 Conviction for Possession of Child Pornography

In 2005, McKathan pled guilty to possessing child pornography, in violation of 18 U.S.C § 2252A(a).  *United States v. McKathan*, Case No. 1:05-cr-00094-CG (S.D. Ala. 2005) ("*McKathan I*" or "2005 Case").  The district court sentenced him to 27 months' imprisonment, plus a lifetime term of supervised release.

Once McKathan completed his prison term in 2007, he began living under the terms of his supervised release.  One of those terms required McKathan "to answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer."  Another allowed his probation officer to conduct reasonable searches of McKathan's residence—including of his electronic devices, since

4

McKathan had also agreed to forgo using a computer with internet access. McKathan's terms of release informed him that if he violated his supervised release, the court could revoke his supervised release and send him back to prison.

## B. McKathan's 2014 Violation of his Supervised Release

In September 2014, McKathan's probation officer, Rafael Goodwin, Jr., became concerned with McKathan. Goodwin had conducted a Facebook search on all sex offenders under his supervision and learned that someone had opened a Facebook account in McKathan's name, in September 2014, using an Android mobile device. Because McKathan's terms prohibited him from using a computer with access to the internet without Goodwin's permission, on September 19, 2014, Goodwin paid McKathan a surprise visit at his apartment to investigate.

When Goodwin walked into McKathan's apartment, he spotted an Android phone on the bed. Upon seeing it, Goodwin asked McKathan if he recently obtained a new phone. McKathan responded that he had had the same phone for some time. Then Goodwin wanted to know whether the phone could access the internet. McKathan conceded that it could. Goodwin examined the phone. Discovering its contents to be protected by a personal identification number ("PIN"), Goodwin instructed McKathan to enter his PIN to unlock the phone, and McKathan complied.

Once Goodwin had access, he explored McKathan's phone. He found that McKathan was using a mobile application for Facebook. Goodwin asked about

McKathan's Facebook use, and McKathan admitted the account Goodwin had found was his. When Goodwin examined the account, he found no inappropriate content on it.

But then Goodwin reviewed McKathan's phone's internet browser history. The browsing history reflected that somebody had visited sites with terms such as "preteen" and "sexy lil girls." Upon seeing this, Goodwin asked McKathan whether he had been viewing child pornography. McKathan conceded he had. So Goodwin confiscated the phone and instructed McKathan to report to Goodwin on September 22, 2014. At Goodwin's request, McKathan also provided him with the PIN itself.

Goodwin took McKathan's phone back to the Probation Office, where he "more thorough[ly] inspect[ed]" it. He found downloaded images of child pornography.

When McKathan checked in with Goodwin on September 22, Goodwin gave McKathan a blank affidavit form and instructed him to write, consistent with McKathan's admissions to Goodwin on September 19, that he had been using his phone to access the internet for a year, and it was the only means he had used to access child pornography. McKathan did as instructed.

The district court then held a hearing to determine whether McKathan's supervised release should be revoked. At this hearing, Christopher Knight represented McKathan. Goodwin testified, describing his Facebook search, the

6

evidence he obtained from accessing McKathan's phone, and McKathan's subsequent admissions.  After hearing Goodwin's testimony, the court revoked McKathan's supervised release and sent him back to prison, to be followed by a reimposed term of supervised release for life, with the same conditions that had been imposed in McKathan's 2005 Case.  We refer in this opinion to the events leading to and resulting in the revocation of McKathan's supervised release as the "Supervised-release Proceedings."

### C. McKathan's 2014 Conviction for Receipt of Child Pornography

That, however, was not the end of the story.  Goodwin had provided the U.S. Attorney's Office with a copy of images he had found on McKathan's phone.  He had also turned McKathan's phone over to the Department of Homeland Security, so its agents could seek a search warrant, relying on Goodwin's investigation. Based entirely on what Goodwin told the Homeland Security agents, they procured a warrant for the phone.  The agents used the PIN McKathan provided to Goodwin to access the phone and then imaged and searched it.  The search revealed that McKathan had downloaded images of child pornography.

In November 2014, a federal grand jury charged McKathan with three counts of knowingly receiving child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A) (Counts One to Three), and one count of knowingly possessing material containing an image of child pornography, in violation of 18 U.S.C.

§ 2252A(a)(5)(B) (Count Four). *United States v. McKathan*, Case No. 1:14-cr-00290 (S.D. Ala. 2014) ("*McKathan II*" or "2014 Case"). Since Knight was familiar with the case from the revocation hearing, the court appointed him to represent McKathan on the new charges.

But McKathan soon filed a *pro se* motion requesting that the court appoint him new counsel. Contrary to McKathan's desire, Knight did not want to file a motion to suppress challenging whether Goodwin's search was lawful under the Fourth Amendment. The district court granted McKathan's motion and appointed Cindy Powell.

Soon after Powell was appointed, McKathan filed a *pro se* motion to suppress "(1) any and all evidence seized as a result of any search and/or seizure and the fruits of any search and/or seizure, [and] (2) any and all written and/or oral statements taken from me and the fruits of any such statements." Three days later, Powell filed an amended motion to suppress on behalf of McKathan. Although the amended motion stated that McKathan sought suppression "pursuant to the 4th, 5th, and 6th Amendments of the U.S. Constitution," it set forth only a Fourth Amendment argument, asserting that the government had obtained McKathan's statements and the fruits of the browser-history search through an illegal search that violated the Fourth Amendment.

8

During the hearing on the suppression motion, defense counsel argued only that McKathan's cell phone does not qualify as a "computer device" that is prohibited by the terms of his supervised release. The district court denied McKathan's amended suppression motion because it found no Fourth Amendment violation. It noted that since McKathan was a supervised releasee, his probation officer needed only reasonable suspicion to conduct a valid search under the Fourth Amendment. And McKathan had supplied that reasonable suspicion when he admitted his phone had access to the internet and implicitly conceded the phone was his.

Since the district court had already found no Fourth Amendment violation, nothing required it to continue its analysis to determine whether some exception for a Fourth Amendment violation rendered the evidence admissible, anyway. Nevertheless, the district court added that, "unless the Government want[ed] to argue otherwise," "there's no inevitable discovery here," and "there was no voluntary consent to the search of his phone." The government did not argue otherwise.

Having lost his suppression motion, McKathan asked Powell about the possibility of entering a conditional plea that would allow him to preserve his right to appeal on the suppression issue. But Powell dismissed the idea and said to McKathan, "Did you not hear [the judge] the other day? You don't have any

meritorious arguments.  There's nothing . . . to preserve."  So Powell advised him that he should consider pleading guilty.

McKathan followed that advice and entered into a plea agreement with the government.  Under that agreement, McKathan pled guilty to one count of knowingly receiving child pornography in violation of 18 U.S.C. § 2252A(a)(2)(A). He also agreed to waive his right to appeal and to file a collateral attack, with limited exceptions.  As relevant here, the waiver did not preclude McKathan from claiming ineffective assistance of counsel in a motion filed under 28 U.S.C. § 2255.  For its part, the government agreed to dismiss the three remaining counts of the indictment. At sentencing, the district court imposed a term of 188 months in prison.

McKathan did not directly appeal his conviction.

### D. McKathan's 28 U.S.C. § 2255 Petition

In November 2015, McKathan filed a *pro se* habeas petition to vacate, set aside, or correct his conviction in the 2014 Case under 28 U.S.C. § 2255.  *McKathan v. United States*, Case No. 1:15-cv-00611-KD (S.D. Ala. 2015) ("*McKathan III*" or "§ 2255 Case").  He asserted that his counsel had been ineffective, in violation of the Sixth Amendment, because they did not challenge the admission of his statements and the fruits of those statements, all of which, McKathan alleged, had been obtained in violation of the Fifth Amendment.

10

McKathan eventually enlisted counsel to assist him and filed an amended habeas petition, raising the same Sixth Amendment claim (based on counsel's failure to seek suppression for an alleged Fifth Amendment violation) McKathan had made in his earlier *pro se* filing.[2]  More specifically, McKathan contended that his counsel (both Knight and Powell) were constitutionally deficient for failing to use the Fifth Amendment—rather than the Fourth Amendment—to seek to suppress his statements to Goodwin about his phone and his PIN, as well as the evidence Goodwin derived from those disclosures.

A magistrate judge held an evidentiary hearing on McKathan's habeas petition.  During that hearing, as relevant here, McKathan presented testimony from Knight and Powell.  In addition, McKathan himself testified.

Knight, who had represented McKathan throughout the Supervised-release Proceedings and during the initial stages of the 2014 Case, testified that he considered filing a motion to suppress based upon the Fourth Amendment.  After reviewing the relevant law, though, Knight concluded that a motion filed on that basis would fail, and he so advised McKathan.

Though Knight looked into a motion based on the Fourth Amendment, he conceded that it never occurred to him to proceed under the Fifth Amendment.  As

---

[2] In his counseled § 2255 motion, McKathan also argued that Powell was ineffective for neglecting to challenge a sentencing enhancement.  The district court ultimately granted this aspect of McKathan's petition and reduced his prison term from 188 months to 180 months.

11

a result, Knight never researched filing a suppression motion premised upon that Amendment.

Cindy Powell, who took over McKathan's defense from Knight in the 2014 Case, testified that she filed the amended motion to suppress based on the Fourth Amendment, even though she advised McKathan it was unlikely to succeed. Powell could not recall whether she discussed with Knight a potential Fifth Amendment challenge to McKathan's statements and their resulting fruits, though she did recall discussing with Knight the futility of filing a motion to suppress. But in any case, like Knight, Powell did not research whether McKathan might have a viable Fifth Amendment suppression claim.

McKathan then took the stand on his own behalf. He stated that his probation officer instructed him that "if [he] did not follow the conditions [of his supervised release,] [he]'d be revoked and go back to prison." So when Goodwin showed up at McKathan's house in September 2014, McKathan understood he had to truthfully answer Goodwin's questions about whether the phone was his, whether it had internet access, and whether he had been using it to view child pornography. He also believed he had to comply with Goodwin's request for the phone's PIN. McKathan had understood that if he had refused to enter his phone's PIN or answer any of Goodwin's questions, then his supervised release "would certainly have been

revoked." To avoid that outcome, he answered Goodwin's questions about the phone and its internet connection, and he provided his PIN.

After considering McKathan's motion and the evidence adduced at the hearing the magistrate judge issued a report and recommendation ("R&R"). As relevant here, the R&R recommended that the district court deny McKathan's § 2255 claim that he received ineffective assistance of counsel when his attorneys did not seek under the Fifth Amendment to suppress his statements and their fruit. The R&R ruled based solely on its finding that McKathan had failed to show prejudice, even assuming his counsel had performed deficiently.[3]

McKathan objected to the R&R, but the district court agreed with it. So addressing only whether McKathan had demonstrated prejudice, the court denied McKathan's § 2255 motion as it pertained to his ineffective-assistance claim based on counsel's failure to file a Fifth Amendment challenge.

Dissatisfied with the court's ruling, McKathan moved under Rule 59(e), Fed. R. Civ. P., for the district court to vacate its judgment and grant his denied ineffective-assistance claim. Alternatively, McKathan asked the district court to issue a Certificate of Appealability ("COA") on the question of "whether the district

---

[3] The R&R nonetheless did opine in a footnote that Powell did not perform deficiently in failing to research or make a Fifth Amendment suppression argument because Knight, who was a "seasoned criminal defense attorney who has litigated numerous Fifth Amendment motions to suppress[,] did not see or raise the issue either."

13

court erred in finding that [he] failed to prove *Strickland*'s[4] prejudice prong of his second § 2255 claim," so he could appeal the district court's denial of his claim.

The district court rejected McKathan's request to vacate its prior judgment. But it granted McKathan's other request and issued a COA on "the issues presented." In light of the fact that the district court denied the habeas claim on *Strickland*'s prejudice prong, we understand the district court to have granted the COA solely on the question of prejudice.

McKathan now appeals.

## II.

On an appeal of a § 2255 motion to vacate, we review legal issues *de novo* and factual findings for clear error. *Rhode v. United States*, 583 F.3d 1289, 1290 (11th Cir. 2009) (per curiam). In a § 2255 proceeding, we "allot substantial deference to the factfinder in reaching credibility determinations with respect to witness testimony." *Devine v. United States*, 520 F.3d 1286, 1287 (11th Cir. 2008) (per curiam) (alteration adopted and citation and quotation marks omitted).

## III.

We begin our analysis with a review of the standard that applies to claims of ineffective assistance of counsel. The Sixth Amendment guarantees criminal defendants the right to counsel. U.S. Const. amend. VI; *Gideon v. Wainwright*, 372

---

[4] *Strickland v. Washington*, 466 U.S. 668 (1984).

U.S. 335, 344–45 (1963).  As the Supreme Court has explained, "the right to counsel is the right to the effective assistance of counsel."  *Strickland v. Washington*, 466 U.S. 668, 684–86 (1984) (citation and quotation marks omitted).  And that right applies not only at a criminal trial but also when a criminal defendant is deciding whether to plead guilty.  *See Lafler v. Cooper*, 566 U.S. 156, 162 (2012); *Hill v. Lockhart*, 474 U.S. 52, 58 (1985).

To succeed on a claim of ineffective assistance of counsel, the defendant must establish both that (1) his counsel's "performance was deficient" and (2) his counsel's "deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687.

Because the district court denied McKathan's petition without considering counsel's performance under *Strickland*, we likewise limit our analysis to considering only *Strickland*'s prejudice requirement.  Under this second prong, McKathan must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  A reasonable probability means "a probability sufficient to undermine confidence in the outcome." *Id.*

In the context of pleas, the prejudice prong "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Lockhart*, 474 U.S. at 59.  We must ask whether a reasonable probability exists that

"but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial." *Id.*  And when the defendant's sole complaint with his counsel's performance stems from her actions in pursuing a plea instead of litigating a suppression issue, the defendant can demonstrate prejudice only if a reasonable likelihood exists that the suppression issue the attorney did not advance would have affected the outcome of the case. *Lee v. United States*, 137 S. Ct. 1958, 1965 (2017).

In assessing the likelihood of success of a suppression motion based on the Fifth Amendment, we must first evaluate the underlying Fifth Amendment legal issue.  If that has merit, we must then consider whether, despite the legal virtue of a Fifth Amendment argument, McKathan's statements and their fruits would have nonetheless been admissible for an independent reason.  Only if the answer to this second question is "no" can McKathan demonstrate that a motion to suppress based on the Fifth Amendment would have been reasonably likely to affect the outcome of his case.  Therefore, in Section III.A., we evaluate the Fifth Amendment issue.  Since we find that it has merit, in Section III.B., we consider whether the government had any independent basis for admission of McKathan's statements and their fruits.

**A.**

We begin by reviewing the right at issue in the forfeited Fifth Amendment suppression motion.  The Fifth Amendment guarantees that "[n]o person . . . shall

be compelled in any criminal case to be a witness against himself . . . ."  U.S. Const. amend. V.  As the Supreme Court has explained, "[t]he essence of this basic constitutional principle is the requirement that the State which proposes to convict and punish an individual produce the evidence against him by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips." *Estelle v. Smith*, 451 U.S. 454, 462 (1981) (cleaned up).  A violation of the Fifth Amendment occurs when "the accused is compelled to make a Testimonial Communication that is incriminating."  *Fisher v. United States*, 425 U.S. 391, 408 (1976).

If an individual is compelled to answer an incriminating question, "his answers are inadmissible against him in a later criminal prosecution.'"  *Murphy*, 465 U.S. at 426 (citation and quotation marks omitted).  The Fifth Amendment not only protects the individual's compelled statements, but also bars the "evidence derived directly and indirectly therefrom" and "prohibits the prosecutorial authorities from using the compelled testimony in any respect."  *Kastigar v. United States*, 406 U.S. 441, 453 (1972).

To succeed under a Fifth Amendment challenge on a motion seeking to suppress his statements to Goodwin and the entry of his PIN (and all fruits stemming from these revelations), McKathan would have had to show three things:  (1) that the government compelled him to make a (2) testimonial communication or act and

17

(3) that the testimonial communication or act incriminated him.  *In re Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011*, 670 F.3d 1335, 1341 (11th Cir. 2012); *United States v. Ghidoni*, 732 F.2d 814, 816 (11th Cir. 1984).

The parties do not dispute that McKathan could have succeeded on the last two elements—that is, he engaged in testimonial communications of his PIN and statements to Goodwin, and those communications incriminated him.  We agree. *See In re Grand Jury Subpoena*, 670 F.3d at 1346–49 (holding that compelling a defendant to produce data protected by his password without providing constitutionally sufficient immunity violates the Fifth Amendment); *see also United States v. Blake*, 868 F.3d 960, 971 (11th Cir. 2017) (holding that a bypass order was necessary or appropriate because there was no other way for the FBI to execute the district court's order to search the contents of an iPad, since they were passcode protected, and the government could not compel the user to provide the passcode, since that would violate the Fifth Amendment).  That leaves us to consider whether McKathan was compelled to make these statements.

1.  The Fifth Amendment privilege can be self-executing

Ordinarily, to claim the protections of the Fifth Amendment, an individual must actually invoke the right not to make statements, or his answers will not qualify as "'compelled' within the meaning of the Amendment." *Murphy*, 465 U.S. at 427 (citation omitted).  Yet the Supreme Court has held that if the government subjects

18

an individual to a practice that denies him "a 'free choice to admit, to deny, or to refuse to answer,'" then any statement he makes to the government is considered compelled. *Garner v. United States*, 424 U.S. 648, 657 (1976) (quoting *Lisenba v. California*, 314 U.S. 219, 241 (1941)). And that statement, along with any evidence to which it leads, cannot be used in a criminal proceeding. *Lefkowitz v. Turley*, 414 U.S. 70, 78 (1973). Put more simply, when the government denies an individual a "free choice" to either speak or remain silent, the Fifth Amendment is considered "self-executing," and an individual need not expressly invoke the right for his statements to be suppressed in a later criminal proceeding. *Murphy*, 465 U.S. at 434–35.

To date, the Supreme Court has identified only three "self-executing" circumstances. *See*, *e.g.*, *Garner*, 424 U.S. at 657–64. These include custodial settings, unless the speaker has knowingly and intelligently waived his privilege to remain silent, *see Miranda v. Arizona*, 384 U.S. 436, 467–69 (1966), extremely limited tax-return-filing circumstances, *see Marchetti v. United States*, 390 U.S. 39, 48–49 (1968), and situations where the government imposes a penalty if the speaker invokes the privilege to remain silent, *see Garrity v. New Jersey*, 385 U.S. 493, 500 (1967). Only the last exception is relevant here.

19

2. <u>The Fifth Amendment privilege is self-executing when the government creates a "classic penalty situation"</u>

In *Murphy*, the Supreme Court examined this last exception in the context of a probationer's statements to his probation officer. Because *Murphy* guides our analysis here, where we consider whether a supervised-releasee's statements to his probation officer occurred in the context of a penalty situation, we examine it in closer detail.

Murphy was sentenced to a suspended prison term and three years of probation. *Murphy*, 465 U.S. at 422. Among other conditions, his probation required him to report to his probation officer as directed and be truthful with the probation officer "in all matters." *Id.*

During one of the probation officer's required meetings with Murphy, the officer informed him that she had received information that Murphy had admitted committing a rape and murder several years earlier. *Id.* at 423–24. Over the course of the meeting, Murphy confessed that he had in fact committed these crimes. *Id.* at 424. A couple of days later, the probation officer obtained an arrest and detention order from the judge who had earlier sentenced Murphy to the term of probation he was serving. *Id.* Not long after that, a grand jury indicted Murphy for first-degree murder. *Id.* at 425. In that new case, Murphy sought suppression of his confession on the basis that the state had procured it in violation of the Fifth and Fourteenth Amendments. *Id.*

20

In evaluating Murphy's claim, the Supreme Court first observed that a defendant does not lose his Fifth Amendment privilege simply because he is imprisoned or on probation. *Id.* at 426. So if the government compels incriminating statements of a prisoner or probationer, those statements are inadmissible in a later trial for a crime other than the one for which the speaker has been convicted. *Id.*

Nevertheless, the Court observed that "the general obligation to appear and answer questions truthfully did not in itself" change any of Murphy's otherwise voluntary statements into compelled confessions. *Id.* at 427. Rather, to compel a statement in the penalty situation, the government must threaten to impose a "substantial" penalty if the speaker chooses to invoke his Fifth Amendment right not to incriminate himself. *Id.* at 434 (citation and quotation marks omitted).

In particular, the Court reasoned, if the government expressly or implicitly suggested that claiming the privilege would lead to revocation of probation, "it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution." *Id.* at 435. So the Court homed in on whether the government expressly or implicitly indicated to Murphy that his invocation of the Fifth Amendment would result in revocation of his probation.

Despite this rule concerning the "classic penalty situation," the Court recognized that the government can "validly insist on answers to even incriminating

21

questions" in the course of probation supervision, provided it understands it may not use the required answers in a separate criminal proceeding, as opposed to a revocation-of-probation proceeding. *Id.* at 435 n.7. Indeed, the Court explained, the government can revoke probation if a probationer refuses to answer a question, in violation of an express condition of probation. *Id.* But the government cannot both require answers to incriminating questions in the course of probation supervision, upon pain of revocation if the probationer invokes his Fifth Amendment privilege, and then also use the answers to those incriminating questions in an independent criminal prosecution. *Id.* at 435 & n.7.

In light of these concerns, the Supreme Court evaluated whether the government had, in fact, required Murphy to answer the probation officer's questions or else have his probation revoked. *See id.* at 437–39. It found that the government had not. *Id.* at 439. In support of this conclusion, the Court noted that (1) Murphy's probation condition precluded only false statements but did not suggest that "his probation was conditional on his waiving his Fifth Amendment privilege with respect to further criminal prosecution"; and (2) no reasonable basis existed for concluding that the state tried to tether an impermissible penalty to a probationer's exercise of the Fifth Amendment privilege. *Id.* at 437–38. As the Court explained, it was aware of no case in which the state had attempted to revoke probation simply because a probationer declined to answer questions about his own

22

criminal conduct, and so against the background of the Supreme Court's jurisprudence prohibiting threats of penalties upon invocation of the Fifth Amendment privilege, "Murphy could not reasonably have feared" that his probation would be revoked merely because he remained silent. *Id.* at 439.

3. *Robinson* created a "classic penalty situation" when it permitted probation to be revoked because the probationer there invoked his Fifth Amendment privilege and thereby refused to comply with the condition of his probation requiring him to completely and truthfully answer his probation officer's questions

Unlike the probationer in *Murphy*, McKathan was under federal supervised release, not state probation. So to apply *Murphy*'s guidance, we must determine whether the conditions of McKathan's federal supervised release threatened to penalize him with revocation of his supervised release if he invoked his Fifth Amendment privilege. We do that by looking to the factors the Supreme Court evaluated in *Murphy*.

First, we examine the precise terms of McKathan's supervised-release condition that he answer his probation officer's questions. McKathan's supervised-release terms required him to "answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer." They further informed him that, "[u]pon a finding of a violation of . . . supervised release, . . . the court may . . . revoke supervision," sending him back to prison. Like the probation terms at issue in *Murphy*, these supervised-release provisions, on their face, prohibit only false

23

statements and do not indicate that McKathan's supervised release "was conditional on his waiving his Fifth Amendment privilege with respect to further criminal prosecution." *Id.* at 437. So if the inquiry ended here, we would find that McKathan's supervised-release terms did not create a penalty situation and therefore did not compel him to incriminate himself.

But the analysis does not end with this step. Rather, we must also consider the second *Murphy* factor, which is whether there was any reasonable basis for McKathan to have thought that his invocation of his Fifth Amendment privilege would result in revocation of his supervised release. *See id.* Relatedly, we also consider whether, in the Eleventh Circuit, the government has successfully attempted to revoke supervised release in any case, merely because the supervised releasee invoked his Fifth Amendment privilege. *See id.* at 439.

McKathan points to *United States v. Robinson*, 893 F.2d 1244 (11th Cir. 1990) (per curiam), as an example of such a case. Robinson was serving a term of probation following his conviction for currency smuggling. *Id.* at 1244. Under his probation agreement, Robinson was required to report to his probation officer and to "give an account of himself and to respond completely and truthfully to questions asked by the probation officer." *Id.* at 1244–45 (alteration adopted and internal quotation marks omitted). Robinson had previously reported $25,000 in income on his tax return but had asserted the Fifth Amendment as to the income's source. *Id.*

24

at 1244 & n.1.  The probation officer asked Robinson about the source of that income.  *Id.* at 1244.  In response, Robinson again claimed his Fifth Amendment privilege to remain silent.  *Id.*  Based on Robinson's refusal to answer the probation officer's question, the court later revoked Robinson's probation.  *See id.*

This Court affirmed.  *Id.* at 1245.  Quoting *Murphy*, we first noted that a probationer's reliance on his Fifth Amendment privilege to avoid self-incrimination does not preclude the government from, as relevant in Robinson's case, "*revoking probation* for a refusal to answer that violated an express condition of probation . . . ."  *Id.* (emphasis added) (quoting *Murphy*, 465 U.S. at 435 n.7).  In applying this rule, we determined that Robinson's failure to "completely and truthfully" report his "continuing . . . unlawful money smuggling activities" as the terms of his probation required was a violation of his probation.  *Id.* (emphasis omitted).  Though we reasoned that "[t]he issue is not invocation of the privilege, but the failure to report," we nonetheless concluded that the failure to report— regardless of why—"alone can justify revocation of probation."  *Id.* (citation and quotation marks omitted).  Because unlike McKathan, Robinson did not challenge the use of his silence in separate criminal charges, our decision was not inconsistent with the Supreme Court's distinction between use of a probationer's statements in revocation proceedings following a prior conviction and their use in a "pending or later criminal prosecution."  *See Murphy*, 465 U.S. at 435 & n.7.

Nevertheless, as the government conceded during oral argument, *Robinson*

does "take the extra, impermissible step" *Murphy* warned against, of requiring a

supervised releasee "to choose between making incriminating statements and

jeopardizing his conditional liberty by remaining silent."[5]   *Id.* at 436; *see* Oral

---

[5] The Dissent contends that it is "not entirely accurate" to state that the government conceded that "*Robinson* took "the extra, impermissible step' *Murphy* warned against" because "[i]nstead, the government merely conceded that there may be a conflict between *Murphy* and *Robinson*, but that *Robinson* could be factually distinguished." Dissent at 49 n.4. We respectfully disagree with our colleague.  First, while the government did not use the words "extra, impermissible step," it is clear that it agreed with that proposition.  In particular, the following exchange occurred at oral argument:

> **Court**: [W]e've said in *Robinson*, if you don't comply with the conditions of your supervised release, you go to jail.  I mean, isn't that what we've said?
> **Government**: That is what you said in that case for *Robinson*.  I do know . . . while *Minnesota v. Murphy*, at least in certain portions disagree with *Robinson* of the fact that . . . a petitioner cannot be forced to give a statement and then go to jail on that, but that is of course what you say in terms of *Robinson*, that they can be revoked.
> **Court**:  . . . Since we're bound by *Robinson*, don't we have to accept that when we're reviewing this?
> **Government**: I think yes, unless we tailor *Robinson* to the specific language that was used in that particular [probation condition requiring the probationer to respond "completely and truthfully" to inquiries from the probation officer].

Oral Argument, at 21:24–22:11.  And second, the government did not suggest that *Robinson* was somehow consistent with *Murphy* or that it could be factually distinguished from *Murphy*; rather, it argued that the probation condition at issue in *Robinson* could be factually distinguished from that at issue in McKathan's case, so *Robinson*'s authorization of punishment for invocation of the Fifth Amendment right not to incriminate oneself did not reasonably suggest that McKathan would be punished for invoking his Fifth Amendment right.  *See id.* at 19:44–20:50.  Later in the oral argument, though, the government effectively conceded that the probation condition at issue in *Robinson* could not be meaningfully distinguished from that at issue here:

> **Court**: [I]f we're holding that the reason that . . . revocation was appropriate was because [Robinson] failed to report [answer] in response to inquiries, which . . . would you agree that's what *Robinson* holds?
> **Government**: Yes.

(cont'd.)

Argument at 20:20–23:10, *Denzil McKathan v. United States.* (No. 17-13358), http://www.ca11.uscourts.gov/oral-argument-recordings?title=17-13358&field_oar_case_name_value=&field_oral_argument_date_value%5Bvalue%5D%5Byear%5D=&field_oral_argument_date_value%5Bvalue%5D%5Bmonth%5D=  ("Oral Argument").  Indeed, it is a case where the government successfully "attempted to revoke probation merely because a probationer refused to make nonimmunized disclosures concerning his own criminal conduct."  *Murphy*, 465 U.S. at 439.

The Dissent asserts that *Robinson* did not "take the extra, impermissible step" that *Murphy*, 465 U.S. at 436, prohibits.  Dissent at 51 n.4.  It bases this argument solely on the premise that in *Robinson*, the government revoked Robinson's probation because Robinson "invo[ked] the privilege" and "was found to be in violation of the reporting condition of his probation, but it was the reporting violation that was the issue, not the defendant's invocation of the privilege."  *Id.* at 50 (emphasis omitted).

Most respectfully, that is a distinction without a difference.  Invoking the privilege and not reporting (meaning not answering questions) after the privilege has

---

**Court**:  . . . Then how could [McKathan] not fail to report so [he] would avoid the *Robinson* problem and still not respond to the question about the PIN?  Is there a way to do that?  Maybe there is.
**Government**:  . . . There may be a way.  At this very moment, I can't think of a way . . . .

Oral Argument, at 26:37–27:30.

been invoked are one and the same thing—like six of one, half dozen of the other. And it is not possible to both invoke the Fifth Amendment privilege *and* "completely and truthfully" answer the probation officer's incriminating question. *See United States v. Saechao*, 418 F.3d 1073, 1080–81 (9th Cir. 2005). *Robinson* necessarily approves of a "classic penalty situation." And a reasonable person in McKathan's position would understand *Robinson* to authorize punishment for a supervised releasee's refusal to answer his probation officer's questions.

Moreover, unlike with the probationer in *Murphy*, the record contains direct evidence that McKathan incriminated himself because he feared that his supervised release would be revoked if he remained silent. *See id.* at 437. McKathan testified that his probation officer instructed him that "if [he] did not follow the conditions [of his supervised release,] [he]'d be revoked and go back to prison." McKathan explained that he understood as a result of this instruction that his supervised release "would certainly have been revoked" if he had refused to enter his phone's PIN or answer any of Goodwin's questions. Operating in a post-*Robinson* world, we cannot say that McKathan's understanding that he was in a "classic penalty situation" was unreasonable.

For that reason, under *Murphy*, the government was well within its rights to revoke McKathan's supervised release, based on the incriminating statements McKathan made in response to Goodwin's questions. But it could not also use those

28

same statements, which McKathan made under the "classic penalty situation," to prosecute McKathan for a new crime.

We are not the first Circuit to reach this conclusion. In *Saechao*, 418 F.3d 1073, the Ninth Circuit considered the same issue we face today. *See id.* at 1075. Saechao's state probation conditions required him to "promptly and truthfully answer all reasonable inquiries by the Department of Correction or County Community Correction Agencies." *Id.* His probation terms also stated that failure to comply with any of the conditions "was grounds for arrest, revocation of probation, or modification of conditions." *Id.* Saechao's probation officer questioned him about whether he possessed a firearm, which would be a violation of his probation and a violation of the felon-in-possession statute. *Id.* at 1075–76. Saechao acknowledged that a hunting rifle was in the apartment that he shared with his parents. *Id.* The probation officer and a colleague then confiscated the rifle and left Saechao's residence. *Id.* at 1076. Soon after, Saechao was arrested and charged with being a felon in possession of a firearm, in violation of federal law. *Id.* In that separate case, Saechao moved to suppress his statements to the probation officer. *Id.* The district court granted the motion, concluding that the statements had been "compelled" within the meaning of the Fifth Amendment. *Id.*

The Ninth Circuit affirmed. *Id.* at 1081. It determined that the state had taken the "impermissible step of requiring Saechao to choose between making

incriminating statements and jeopardizing his conditional liberty by remaining silent." *Id.* at 1076 (quoting *Murphy*, 465 U.S. at 436) (alterations adopted and quotation marks omitted). And it found further that "there [was] certainly a reasonable basis under *Murphy* for a probationer to conclude that, although the invocation of the Fifth Amendment [was] not *explicitly* prohibited, an exercise of that right by invoking the privilege or simply by remaining silent would constitute grounds for revocation of probation." *Id.* at 1079 (emphasis in original).

In reaching these conclusions, the Ninth Circuit explained that the condition requiring Saechao to "promptly and truthfully *answer* all reasonable inquiries" required Saechao to actually provide an answer to the question asked, and invoking the Fifth Amendment privilege to remain silent would not be an "answer" to the question. *Id.* at 1080 (emphasis in original). In support of this determination, the Ninth Circuit pointed to *Robinson*. *Id.* at 1080–81. It said, "[t]he Eleventh Circuit, confronted with a nearly identical probation condition, explicitly rejected the argument that by 'answering' a probation officer's inquiry with an invocation of the Fifth Amendment, the probationer would comply with an obligation to answer or respond to his probation officer's inquiries and thereby avoid a revocation of his probation." *Id.* at 1080. Rather, the Ninth Circuit explained, "the Eleventh Circuit held that invoking the Fifth Amendment did not constitute a response to a question, but rather was a refusal to answer that violated an express condition of probation."

30

*Id.* at 1081 (citation and quotation marks omitted).  As a result, the Ninth Circuit observed, Robinson's invocation of his Fifth Amendment privilege "promptly led the government to seek the revocation of Robinson's probation, which the district court granted and the Eleventh Circuit affirmed."  *Id.* (citing *Robinson*, 893 F.2d at 1244–45).

The U.S. Sentencing Commission has also felt a need in the wake of post-*Murphy* opinions like *Robinson* to clarify that defendants should not be punished for failing to truthfully answer their probation officer's questions if the failure resulted from an invocation of the Fifth Amendment privilege.  In 2016, the Commission, in Amendment 803, added Application Notes to the Commentary to Sections 5B1.3 and 5D1.3 of the U.S. Sentencing Guidelines Manual that effectively abrogate *Robinson*.  *See* U.S. Sentencing Guidelines Manual amend. 803 (U.S. Sentencing Comm'n 2016).  They state, "[a]lthough the condition in subsection (c)(4) requires the defendant to 'answer truthfully' the questions asked by the probation officer, a defendant's legitimate invocation of the Fifth Amendment privilege against self-incrimination in response to a probation officer's question shall not be considered a violation of this condition."  U.S.S.G. § 5B1.4, cmt. n.1 (2016); U.S.S.G. § 5D1.3, cmt. n.1 (2016).  Since these application notes were made effective November 1, 2016, no supervised-releasee who chose or chooses to answer questions after that

31

date could demonstrate that he reasonably believed or believes he was or is faced with the "classic penalty situation" *Murphy* prohibits.

But McKathan answered his probation officer's questions in 2014, before the Sentencing Commission promulgated Amendment 803. So Amendment 803 cannot control our analysis in his case.

Nevertheless, the changes to the Commentary further demonstrate that we held in *Robinson* that the government may revoke supervised release simply because a probationer invokes his Fifth Amendment privilege in response to a question from his probation officer. Having so held in that case, we may not now find that McKathan's supervised-release provision requiring him to answer all inquiries from his probation officer did not place him in the "classic penalty situation" *Murphy* warns against.

> 4. *Robinson*'s existence requires us to conclude that McKathan's view that he was subjected to a "classic penalty situation" was objectively reasonable

As we have noted, in *Robinson*, the government did not seek to use Robinson's silence in a separate criminal prosecution, and Robinson did not complain in a separate criminal proceeding that he had been coerced to answer his probation officer's questions on penalty of revocation of his probation. Rather, the government used Robinson's silence—and Robinson objected that the government used his silence—only to punish him for violating his probation conditions. But that

32

is permissible under *Murphy*.  What is not permissible is giving a probationer a reasonable belief that if he refuses to answer his probation officer's incriminating questions, his probation will be revoked *and then using statements derived as a result of that "classic penalty situation" in a criminal prosecution.*  Because of *Robinson*'s existence, though, that is what happened here, in McKathan's case.

We suggested in 2003 that a case like McKathan's might well require suppression, in a criminal prosecution, of statements elicited by a probation officer in the course of supervising supervised release:

> There is thus a substantial basis in our cases for concluding that if the State, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution.

*See United States v. Zinn*, 321 F.3d 1084, 1091 (11th Cir. 2003) (quoting *Murphy*, 465 U.S. at 435).  Here, because of *Robinson* and the government's use of McKathan's coerced statements in his separate criminal prosecution, McKathan's counsel could have argued that suppression was required on exactly this "substantial basis."

Finally, the laundry list of cases the Dissent sets forth for the proposition that a penalty may not be imposed on someone for exercising his Fifth Amendment right not to incriminate himself, *see* Dissent at 49-50, does not change the analysis or somehow allow us to ignore *Robinson*.  The cited cases speak in general principles;

33

none of them other than *Murphy* and *Robinson* themselves deals with the ways in which the government coerced or made use of compelled testimony that are at issue here.[6] And we have already explained why, under *Murphy*, *Robinson* creates the "classic penalty situation" here, where the supervised-releasee's statements, coerced on pain of revocation for invocation of the Fifth Amendment privilege, were used against him in a separate criminal case.

In short, we conclude that there is a reasonable likelihood that a Fifth Amendment suppression motion would have been successful.

**B.**

That brings us to whether the fruits of McKathan's statements would have nonetheless been admissible for an independent reason. The government argues that they would have been, so any Fifth Amendment legal win would have been a purely Pyrrhic victory.[7]

---

[6] For example, besides predating both *Murphy* and *Robinson*, *Baxter v. Palmigiano*, 425 U.S. 308, 316 (1976), and *Lefkowitz v. Turley*, 414 U.S. 70, 85 (1973), deal with the use of compelled statements in civil, rather than criminal, proceedings. *Chavez v. Martinez*, 538 U.S. 760 (2003), also does not involve use of compelled statements in criminal proceedings. *Id.* at 769–70. *United States v. Vangates*, 287 F.3d 1315 (11th Cir. 2002), while a little closer in that the criminal defendant claimed she had been subjected to a "classic penalty situation," is similarly irrelevant here. There, Vangates, a police officer, incriminated herself during her testimony in a civil trial for which she was subpoenaed to testify by a private attorney. The government prosecuted her, using her statements. We concluded the statements had not been coerced because no state action compelled her to forgo her Fifth Amendment rights. *Id.* at 1324.

[7] The term "Pyrrhic victory," where the battle is won but the war is lost, finds its origins in the ultimately ill-fated war pursuits of King Pyrrhus of Epirus. ThoughtCo., *What's the Origin of the Term Pyrrhic Victory?*, https://www.thoughtco.com/pyrrhic-victory-120452 (last visited Aug. 11, 2020). Pyrrhus is said to have suffered the first Pyrrhic victory around 280 B.C.E. *Id.* Though

34

In particular, the government suggests that it would have inevitably discovered the evidence of child pornography on McKathan's phone, since McKathan's supervised release required him to consent to reasonable searches, and Goodwin had reason to suspect he was violating the terms of his release. Goodwin's beliefs were based on the following: McKathan had a Facebook account and opened it with an Android phone, and he had an Android phone on his bed.

The "inevitable discovery" doctrine applies when the government can show by a preponderance of the evidence that it would have discovered the evidence by some other lawful means. *See Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) ("[T]he inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source."); *Nix v. Williams*, 467 U.S. 431, 444 (1984). For that doctrine to apply in this Circuit, the government must also demonstrate that before the unlawful activity occurred, it was actively pursuing the lawful means that would have rendered discovery inevitable. *United States v. Virden*, 488 F.3d 1317, 1322 (11th Cir. 2007). The inevitable-discovery doctrine can apply when a Fifth Amendment violation occurs. *United States v. Martinez-Gallegos*, 807 F.2d 868, 870 (9th Cir. 1987) (per curiam).

---

he defeated the Romans in two battles, he endured an extremely high number of casualties. *Id.* As a result, he wound up eventually losing the war. *Id.*

Here, in the context of McKathan's § 2255 Case, the district court had no reason to analyze—and the government had no reason to argue—whether the inevitable-discovery doctrine could apply, since the district court determined that McKathan could not prevail on his Fifth Amendment argument.[8]  For these reasons, the record lacks information that would allow us to assess the viability of an inevitable-discovery argument.  Therefore, we cannot determine whether, as a legal matter, the government would have been permitted to search McKathan's phone. Nor can we assess the government's proffer at oral argument that it would have been able to view the contents without compelling McKathan to provide his PIN to unlock it, since it "has tools and has methods, and has used them in many cases to get in[to] [phones] before."  Oral Argument at 24:17–24:23.

As a result, we cannot evaluate, in the final analysis, whether there was a reasonable likelihood that the outcome of McKathan's case would have been different, had his counsel filed a suppression motion based on the Fifth Amendment. But because McKathan would have prevailed on the Fifth Amendment suppression

---

[8] When it ruled on McKathan's Fourth Amendment suppression motion in *McKathan II*, the district court did say that it saw no basis for inevitable discovery on the record before it at that time, and the government did not object.  But that did not occur in McKathan's § 2255 Case.  And at the time the district court remarked on the inevitable-discovery doctrine, it had just ruled on a clearly unmeritorious Fourth Amendment suppression motion (and the Fifth Amendment argument had not been made at that time).  So neither the court nor the government had any reason to actually evaluate any alternative bases for admission of the evidence from McKathan's phone. Under these circumstances, we cannot say that the government waived its right to pursue an inevitable-discovery argument.

issue, it now becomes necessary to consider whether the evidence would have otherwise been admissible.

Therefore, we must vacate the denial of McKathan's § 2255 motion and remand for further proceedings. In those proceedings, the government must receive the opportunity to present any evidence and arguments to show that the evidence from McKathan's phone would have otherwise been admissible, and the district court shall rule on any such arguments. Should the district court conclude that the evidence would have been otherwise admissible, it shall deny the § 2255 motion, since filing the Fifth Amendment suppression motion would not have been reasonably likely to change the outcome in *McKathan II*. But should the district court determine that the evidence would not have been otherwise admissible, it shall address whether McKathan's counsel performed deficiently by failing to raise the Fifth Amendment issue in *McKathan II*. *See Strickland*, 466 U.S. at 687.

## IV.

For these reasons, we vacate the district court's denial of McKathan's § 2255 motion and remand for further proceedings consistent with this opinion.

**VACATED AND REMANDED.**

BRANCH, Circuit Judge, dissenting:

In this case, McKathan, while on supervised release as a result of his 2005 conviction for possession of child pornography, failed to invoke his Fifth Amendment privilege in response to his probation officer's questions and made testimonial statements (including revealing his PIN which was used to unlock his phone) that both revealed he had violated the terms of his release and implicated himself in a new crime. His supervised release was thereafter revoked based upon a finding that he had violated the terms of his release. The government then used the incriminating statements he made to his probation officer against him in a subsequent criminal prosecution for receipt of child pornography. After pleading guilty to the new charge, McKathan filed a 28 U.S.C. § 2255 motion to vacate sentence arguing that his counsel was ineffective for failing to file a Fifth Amendment-based motion to suppress the testimonial communications he made to his probation officer. The district court denied the claim, concluding that he failed to establish prejudice. This appeal followed. To address McKathan's ineffective-assistance claim, we must consider the underlying merits of his Fifth Amendment challenge. Because I disagree with the majority that McKathan's failure to invoke the Fifth Amendment privilege should be excused, I respectfully dissent.

The ultimate question in this case is whether McKathan established that he

38

was prejudiced by his counsel's failure to file a Fifth Amendment based motion to suppress the testimonial communications he made to his probation officer pursuant to the two-prong deficient performance and prejudice test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To establish prejudice, McKathan must show "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Premo v. Moore*, 562 U.S. 115, 129 (2011) (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)).  This inquiry in turn requires an evaluation of the merit of the underlying Fifth Amendment challenge.  *See Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986) (explaining that when defense counsel's failure to litigate a suppression issue is the basis of the ineffectiveness claim, in order to demonstrate prejudice, the defendant must prove that his suppression claim is meritorious, and that there is a "reasonable probability" that  the suppression issue the attorney did not advance would have affected the outcome of the case); *see also Lee v. United States*, 137 S. Ct. 1958, 1965 (2017) (explaining ineffectiveness claim premised on counsel's failure to litigate a suppression issue in the context of a plea).

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ."  U.S. Const. amend. V.  To succeed on a motion seeking to suppress his statements to the probation officer and the entry of his PIN (and all fruits stemming from these revelations), based on a

39

Fifth Amendment challenge McKathan would have had to show three things: "(1) compulsion, (2) a testimonial communication or act, and (3) incrimination." *In re Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011*, 670 F.3d 1335, 1341 (11th Cir. 2012). As the majority notes, the parties do not dispute that the communications at issue satisfy the last two elements. Therefore, the only question we must answer is whether McKathan has satisfied the first element—was he compelled to provide the incriminating communications in question? The majority says the answer to this inquiry is yes because McKathan was in a "classic penalty situation." A "classic penalty situation" arises when a person must choose between incriminating himself, on the one hand, or suffering government-threatened punishment for invoking his Fifth Amendment privilege to remain silent, on the other. *Minnesota v. Murphy*, 465 U.S. 420, 435 (1984).

As previously noted, at the time of the statements in question, McKathan was serving a lifetime term of supervised release after pleading guilty and serving a term of imprisonment for possession of child pornography. In relevant part, the terms of his supervised release: (1) required McKathan "to answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer"; (2) prohibited him from possessing and using a computer with internet access without the permission of his probation officer; (3) authorized his consent "to periodic, unannounced examinations of his computer equipment, which may

40

include retrieval and copying of all data from his computer and any internal or external peripherals to ensure compliance with this condition, and/or removal of such equipment for the purpose of conducting a more through [*sic*] inspection"; and (4) authorized his consent to reasonable searches of his person and residence based upon reasonable suspicion that he had violated a condition of his release.[1] Finally, McKathan's terms of release informed him that "[u]pon a finding of a violation of probation of supervised release, . . . the [c]ourt may (1) revoke supervision or (2) extend the term of supervision, and/or (3) modify the conditions of supervision."

I now turn to McKathan's Fifth Amendment challenge. Ordinarily, to claim the protections of the Fifth Amendment, an individual must expressly invoke the right, or his answers will not qualify as "'compelled' within the meaning of the Amendment." *Murphy*, 465 U.S. at 427. It is undisputed that McKathan provided incriminating testimonial statements to his probation officer and did not invoke his

---

[1] While the supervised release conditions imposed are not at issue, I note that "[a] probation condition is not necessarily invalid simply because it affects a probationer's ability to exercise constitutionally protected rights." *Owens v. Kelley*, 681 F.2d 1362, 1366 (11th Cir. 1982) (quoting *United States v. Tonry*, 605 F.2d 144, 150 (5th Cir. 1979)). Rather, "[p]robationers . . . are subject to limitations to which ordinary citizens are free. Such limitations are permitted because probationers have been convicted of crimes and have thereby given the state a compelling interest in limiting their liberty in order to effectuate their rehabilitation and to protect society. Probationers also have a diminished expectation of privacy. Because they have been convicted of crimes for which they could be incarcerated, probationers reasonably expect infringements on their privacy which law-abiding citizens neither expect nor receive." *Id.* at 1367–68 (internal citations and quotations omitted).

Fifth Amendment privilege. Yet, as relevant here, where an individual is faced with a classic penalty situation, the privilege becomes self-executing. *Id.* at 434–35 (citing *Garrity v. New Jersey*, 385 U.S. 493 (1967)).

As in this case, the issue before the *Murphy* Court was whether the Fifth Amendment prohibited the admission of incriminating statements the defendant made to his probation officer in a subsequent criminal prosecution for another crime, notwithstanding the fact that the defendant failed to claim the privilege. 465 U.S. at 422. Specifically, Murphy was on probation after pleading guilty to false imprisonment. *Id.* The terms of his probation included that he participate in a treatment program for sexual offenders, "report to his probation officer as directed, and be truthful with the probation officer 'in all matters.'" *Id.* Murphy was informed that if he failed to comply with these conditions, he could be "return[ed] to the sentencing court for a probation revocation hearing." *Id.* His probation officer later learned that during treatment in the sexual offender program, Murphy admitted to an earlier rape and murder. *Id.* at 423. The probation officer called Murphy in for a meeting, and, during the course of the meeting, Murphy denied the false imprisonment charge to which he had pled guilty, but admitted that he had committed the rape and murder. *Id.* at 423–24. An arrest warrant was issued, and the State later returned an indictment charging Murphy with first-degree murder. *Id.* at 424–25. Seeking to suppress the use of his incriminating statements in the

42

new criminal proceeding, Murphy argued that his failure to assert the Fifth

Amendment privilege should have been excused because "he was compelled to

make incriminating disclosures instead of claiming the privilege" as his probation

could be revoked "if he was untruthful to his probation officer." *Id.* at 434.  The

Supreme Court ultimately found this contention "unpersuasive on close

examination." *Id.*  Specifically, the Court found that the terms of Murphy's

probation "proscribed only false statements; it said nothing about his freedom to

decline to answer particular questions and certainly contained no suggestion that

his probation was conditional on his waiving his Fifth Amendment privilege with

respect to further criminal prosecution." *Id.* at 437.  Thus, like *Murphy*, this case

requires a determination of whether McKathan's failure to assert the privilege

should be excused (*i.e.*, did the circumstances give rise to self-executing privilege

against self-incrimination).[2]

The relevant factors we must consider in making this determination are:

(1) whether the government in fact required McKathan via the terms of his

supervised release to answer the probation officer's question or else have his

probation revoked; or (2) whether there was any reasonable basis for McKathan to

have thought that his invocation of his Fifth Amendment privilege would in and of

---

[2] Similar to Murphy, McKathan asserts that he believed that his supervised release would be revoked if he was not truthful with his probation officer, and, therefore he was "compelled" to make the incriminating statements instead of claiming the privilege.

43

itself result in revocation of his supervised release. *See id.* at 434–39. I agree with the majority that, just as in *Murphy*, the answer to the first inquiry in McKathan's case is a resounding no. The terms of McKathan's supervised release, on their face, merely proscribe only false statements, and do not indicate, explicitly or implicitly, that his release was in any way "conditional on his waiving his Fifth Amendment privilege with respect to further criminal prosecution." *Id.* at 437.

This conclusion leads us to the second inquiry—whether it was reasonable for McKathan to conclude that he faced a "classic penalty situation." How do we tell if McKathan's belief was reasonable? The Supreme Court's opinion in *Murphy* provides guidance. In *Murphy*, without deciding whether the reasonableness inquiry is subjective or objective, the Court held that Murphy's belief that he was in a classic penalty situation was unreasonable because: (1) there was "no direct evidence Murphy confessed because he feared that his probation would be revoked if he remained silent," (2) Supreme Court case law made it clear that such a revocation is constitutionally impermissible, and (3) no case had been identified where the state "attempted to revoke probation *merely* because a probationer refused to make nonimmunized disclosures concerning his own criminal conduct." *Id.* at 438−39 (emphasis added). Applying a similar analysis to this case, the majority holds that McKathan's belief that his supervised release would have been revoked if he did not answer the probation officer's questions

44

was reasonable because there is direct evidence that he feared as much and there is caselaw in this Circuit where the government attempted to revoke probation merely because the probationer asserted his Fifth Amendment privilege.  I disagree.

The majority points to McKathan's testimony during the § 2255 evidentiary hearing that he was instructed that "if [he] did not follow the conditions that [he would] be revoked and go back to prison" as direct evidence that McKathan reasonably feared that his supervised release would be revoked if he did not answer the probation officer's questions.  But that instruction in and of itself does not render McKathan's alleged belief that he was in a classic penalty situation reasonable.  If it did, then the Supreme Court would have determined that there was a reasonable basis for Murphy—who was likewise informed that if he failed to comply with the conditions of his probation then his probation could be revoked—to believe he was in a classic penalty situation, which was not the Court's holding. *Id.* at 422, 437–39.  Indeed, like Murphy, McKathan was not expressly advised that an assertion of the privilege would result in the imposition of a penalty—a factor the Supreme Court cited in distinguishing Murphy's case from the classic penalty situation it found existed in *Garrity*.[3]  *Id.* at 438.

---

[3] In *Garrity*, two New Jersey police officers were subjected to questioning as part of an investigation by the state attorney general concerning alleged fixing of traffic tickets. 385 U.S. at 494.  Prior to being questioned, each officer was warned that: "(1) that anything he said might be used against him in any state criminal proceeding; (2) that he had the privilege to refuse to answer if the disclosure would tend to incriminate him; but (3) that if he refused to answer he

Likewise, McKathan's asserted understanding that, because of this instruction, his supervised release "would certainly have been revoked" if he refused to answer the probation officer's questions was simply not reasonable under the circumstances. As in *Murphy*, the terms and conditions of McKathan's supervised release were "accurately summarized" in the notices provided to McKathan detailing both the standard and special conditions of his release. *See id.* at 438. Both notices provided that "[u]pon a finding of a violation of probation or supervised release, I understand that the court *may* (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision." (emphasis added). And, McKathan, a high school graduate with "some college" education, signed the documents detailing the terms and conditions of his release, attesting that they were read to him, that he had been provided with copies of the notices, and that he understood the conditions. Regardless, even accepting McKathan's contentions that he believed his supervised release would be revoked for exercising his Fifth Amendment privilege, as the Supreme Court concluded in *Murphy*, "that belief would not have been reasonable" in light of

_____

would be subject to removal from office." *Id.* The officers answered the questions posed to them, and some of those answers were used in subsequent criminal proceedings against them for conspiracy to obstruct the administration of traffic laws. *Id.* at 495. The Supreme Court determined that those officers were in a classic penalty situation—"[t]he choice imposed . . . was one between self-incrimination or job forfeiture." *Id.* at 496. Therefore, the Court held that the officers had not waived the Fifth Amendment privilege even though they failed to assert it, and the statements were coerced and could not be used against the officers in subsequent criminal proceedings. *Id.* at 498–500.

46

Supreme Court decisions that "have made clear that the [government] could not constitutionally carry out a threat to revoke [a term of supervised release] for the legitimate exercise of the Fifth Amendment privilege." *Id.*

McKathan and the majority point to this Circuit's decision in *United States v. Robinson*, 893 F.2d 1244 (11th Cir. 1990) (per curiam), as supporting the reasonableness of McKathan's classic penalty situation belief.   They contend that *Robinson* is purportedly an example of a case in which the government attempted to revoke a term of probation merely because a defendant invoked his Fifth Amendment privilege, and we then sanctioned such an attempt by affirming on appeal.   Thus, according to the majority, "[o]perating in a post-*Robinson* world, we cannot say that McKathan's understanding that he was in a 'classic penalty situation' was unreasonable."

But *Robinson* was not a classic penalty situation case where the government attempted to revoke a defendant's probation simply because he invoked his Fifth Amendment privilege.   To the contrary, consistent with *Murphy* and countless other Supreme Court cases, *Robinson* expressly acknowledged that "a probationer has a fifth amendment right to avoid self-incrimination."  893 F.2d at 1245. Rather, the issue before us in *Robinson* was "whether the United States may revoke probation where the probation agreement explicitly requires a probationer to report [his sources of income] and to 'give an account of' [himself] and to respond

47

completely and truthfully to questions asked by the probation officer" about that report but the probationer does not do so. *Id.* at 1244–45. Indeed, when questioned about the source of income reported on his tax return, Robinson, a convicted currency smuggler, invoked the privilege, suffered no penalty upon invocation of the privilege, and was not compelled to give any statements over his claim of privilege. *Id.* True, Robinson's probation was later revoked because he was found to be in violation of the reporting condition of his probation, but it was the *reporting violation* that was the issue, not the defendant's invocation of the privilege. *Id.* at 1245 ("When Robinson failed to report these activities *completely and truthfully* as per the terms of his probation, he committed a probation violation. The issue was *not* invocation of the privilege, but the failure to report. '[T]here is no question that failure to comply with reporting requirements is a serious violation of probationary conditions, and that such failure alone can justify revocation of probation.'" (second emphasis added) (quoting *United States v. Morin (Roger), a/k/a Video (Paris)*, 889 F.2d 328, 332 (1st Cir. 1989))). That his probation was thereafter revoked, at least in part, for his failure to fulfill the terms of his probation by responding "completely and truthfully" to questions asked by the probation officer is not inconsistent with *Murphy*. As the *Murphy* Court acknowledged, while the government cannot revoke a defendant's probation as a penalty for the defendant invoking the Fifth Amendment privilege, "nothing in the

48

Federal Constitution would prevent [the government] from revoking probation for a refusal to answer that violated an express condition of probation or from using the probationer's silence as 'one of a number of factors to be considered by a finder of fact' in deciding whether other conditions of probation have been violated." *See Murphy*, 465 U.S. at 435 n.7 (quoting *Lefkowitz v. Cunningham*, 431 U.S. 801, 808 n.5 (1977)).[4]

Accordingly, contrary to the majority's conclusion, "McKathan's understanding that he was in a 'classic penalty situation'" was not reasonable simply because he was "in a post-*Robinson* world." In fact, such a belief is directly contradicted by *Robinson*'s express acknowledgement that "a probationer has a fifth amendment right to avoid self-incrimination," *Robinson*, 893 F.2d at 1245, as well as a plethora of well-established precedent from both the Supreme Court and this Court. *See, e.g.*, *Chavez v. Martinez*, 538 U.S. 760, 768–69 (2003) ("[N]o 'penalty' may ever be imposed on someone who exercises his core Fifth

---

[4] Thus, contrary to the majority's position, *Robinson* does not "take the extra, impermissible step" *Murphy* warned against, of requiring a supervised releasee "to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent." Indeed, the majority goes as far as to say that the government also concedes that *Robinson* took "the extra, impermissible step" *Murphy* warned against, but that is not entirely accurate. Instead, the government merely conceded that there may be a conflict between *Murphy* and *Robinson*, but that *Robinson* could be factually distinguished. Oral Argument at 21:25–22:05, *Denzil McKathan v. United States.* (No. 17-13358), http://www.ca11.uscourts.gov/oral-argument-recordings?title=17-13358&field_oar_case_name_value=&field_oral_argument_date_value%5Bvalue%5D%5Byear%5D=&field_oral_argument_date_value%5Bvalu e%5D%5Bmonth%5D= ("Oral Argument")

Amendment right not to be a 'witness' against himself in a 'criminal case.'");

*Murphy*, 465 U.S. at 426; *Baxter v. Palmigiano*, 425 U.S. 308, 316 (1976)

(explaining that prisoners have Fifth Amendment rights, and, therefore, if they are

compelled to furnish incriminating testimonial evidence during prison disciplinary

proceedings, "they must be offered 'whatever immunity is required to supplant the

privilege'" (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 85 (1973))); *United States v.*

*Vangates*, 287 F.3d 1315, 1320 (11th Cir. 2002) (noting that a person cannot be

penalized for asserting the Fifth Amendment privilege).  In light of well-

established precedent "proscribing threats of penalties for the exercise of Fifth

Amendment rights, [McKathan] could not reasonably have feared that the assertion

of the privilege would have led to revocation."  *Id.* at 439.

Consequently, for the above reasons, McKathan did not face a classic penalty

situation, and, therefore, he cannot benefit from this exception to the general rule

that the Fifth Amendment privilege must be claimed and is not self-executing.  As

in *Murphy*, McKathan's Fifth Amendment challenge is without merit and the

statements he made to his probation officer could be used in a subsequent criminal

proceeding. *Id.* at 440.  Thus, McKathan cannot demonstrate that he was prejudiced

by counsel's failure to file a Fifth Amendment motion to suppress the testimonial,

incriminating statements at issue,  *Hill*, 474 U.S. at 59, and I would affirm the denial

of his § 2255 petition.  I respectfully dissent.