[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-11198

_____

D.C. Docket No. 9:18-cr-80153-WPD-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BALMY LINCOLN JOSEPH,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 27, 2020)

Before WILLIAM PRYOR, Chief Judge, TJOFLAT and HULL, Circuit Judges.

HULL, Circuit Judge:

After a jury trial, Balmy Joseph appeals his four drug convictions and

sentences for conspiring to possess with intent to distribute heroin and possessing with intent to distribute heroin and fentanyl. After review, we affirm.

## I.  FACTUAL BACKGROUND

As background, we first recount some of the evidence presented at trial about how the officers searched Joseph's apartment and garage.

### A.  July 7, 2018

While conducting surveillance in an unrelated investigation,[1] officers encountered Delson Marc driving a black SUV with defendant Balmy Joseph in the passenger seat. When Marc spotted the officers, he fled in the SUV. After a pursuit, Marc and Joseph abandoned the SUV and escaped on foot. Eventually, officers found the abandoned SUV and recovered nearby heroin capsules and a bag containing heroin and other narcotics on the ground.

### B.  July 8–17, 2018

Officers began tracking down Marc. Data from a license plate reader indicated that the black SUV recently was at an apartment complex called Luma in West Palm Beach.[2] Following the lead, officers spoke to Stephanie Simmons, the

---

[1]The unrelated investigation was about a recent homicide on July 6, 2018, but the jury was not told that fact. On July 7, 2018, the police were surveilling a gray Honda Accord that was seen on surveillance videos that captured the murder.

[2]A license plate reader is a device that automatically reads and records the license plate numbers of vehicles that pass it. Based on this data, officers can know when certain vehicles were at certain locations.

2

assistant manager at the Luma apartments.  Officers showed Simmons a photograph of Marc, Joseph, and others posing at a social gathering, and asked her if she recognized any of them.  Simmons did not recognize Marc, but she did recognize defendant Joseph, whom she knew as "Wilbert Desir."  Simmons told the officers that "Desir" rented apartment number 5304 and a separate garage unit, both in the complex.  Through Simmons, the government entered evidence of the rental application and lease in the name of Wilbert Desir.

The real Wilbert Desir, who also testified at trial, had the same birthdate and social security number as those provided by defendant Joseph in his rental application.  The real Wilbert Desir did not know Joseph, never authorized Joseph to use his personal identifying information, and did not rent the apartment.

## C.    July 18, 2018

On July 18, 2018, officers executed warrants to search Joseph's apartment number 5304 and garage.[3]  As the officers approached the apartment to execute the warrants, they encountered defendant Joseph, who immediately removed two flip-style cellphones from his pocket and broke them in half.  When the officers explained that they had a search warrant for his apartment, Joseph denied living

---

[3]As discussed later, the affidavits for the search warrants also included information obtained from a prior search of a black Audi sedan conducted as part of the unrelated homicide investigation.  Since the jury did not know about the Audi search or the homicide investigation, we discuss that information later only as to defendant Joseph's motion to suppress.

3

there and said he was visiting a friend. Officers found a key to the apartment in Joseph's pocket, along with over $700 in cash and two additional cellphones.

A search of the two-bedroom apartment revealed numerous documents in the name of Wilbert Desir, a utility bill addressed to "Balmy Joseph c/o Wilbert Desir" at that location, and other mail addressed to "Balmy Joseph" at his mother's address. Inside Joseph's bedroom, officers found Joseph's jacket containing multiple bags of heroin and fentanyl. In Joseph's bathroom, officers found narcotics packaging materials, a digital scale, a blender, and three bottles of a cutting agent used to dilute narcotics. In the kitchen, officers found a computer bag containing a credit card scanner and two laptops.

Inside the other bedroom, officers found $27,000 in cash, a backpack containing a garage door remote control, and a set of keys near the backpack. It appeared that Marc lived in this other bedroom because the backpack that officers found also contained Marc's belongings, and a medicine cabinet in that bedroom's bathroom contained Marc's prescription medication.

Next, the officers went to defendant Joseph's rented garage unit, which they opened with the garage door remote control. Inside, they found a locked freezer, which they opened with the keys they had found in Joseph's apartment. The freezer contained two scales similar to the scale found in Joseph's bathroom. The freezer was packed with multiple bags containing over seven kilograms of heroin,

4

fentanyl, and other controlled substances, with a total estimated street value of $1.4 million.

## II.  PRE-TRIAL PROCEEDINGS

A second superseding indictment charged defendant Joseph with: (1) conspiring to possess with intent to distribute over a kilogram of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count 1); (2) possession with intent to distribute over a kilogram of heroin, in violation of § 841(a)(1), (b)(1)(A), and 18 U.S.C. § 2 (Count 2); (3) possession with intent to distribute a detectable amount of fentanyl, in violation of § 841(a)(1), (b)(1)(C), and § 2 (Count 3); and (4) possession with intent to distribute a detectable amount of heroin, in violation of § 841(a)(1), (b)(1)(C), and § 2 (Count 4).[4]

### A.    Joseph's Motion to Suppress

Before trial, defendant Joseph filed a motion to suppress all evidence seized from his apartment and garage on July 18.  Joseph argued that the affidavits for the search warrants for his apartment and garage contained information unlawfully obtained during an earlier July 9 search of a black Audi that was conducted in an unrelated homicide investigation.  Because the search of the Audi was illegal,

---

[4]Earlier indictments charged both Joseph and Delson Marc with narcotics offenses and Marc with firearm offenses.  Codefendant Marc pled guilty to: (1) conspiracy to possess with intent to distribute heroin; (2) possession with intent to distribute heroin; and (3) possession of a firearm as a felon.  The district court imposed 240 months' imprisonment on the drug counts and a 120-month sentence on the firearm count, all to run concurrently.  The second superseding indictment charged only Joseph.

Joseph argued, the search warrants containing information from the Audi search were also illegal.

At the suppression hearing, Detective James Evans, the affiant for the search warrant for the Audi, testified. Detective Evans explained that he was conducting a homicide investigation of the July 6, 2018 murder of Frederick Stockton. Detective Evans learned that, on the morning of the murder, Stockton was followed by a driver and a passenger in a black Audi sedan. Surveillance videos captured that information and even the murder later that afternoon. The video of the murder showed two gunmen get out of a different car—a gray Honda Accord— and kill Stockton. The police found the Honda and learned that Jason Jean-Gilles had been driving it.

Tactical Agent Jimmy Francisco testified that he assisted with the Stockton homicide investigation. On July 8, with Jean-Gilles now a suspect, officers established surveillance at Jean-Gilles's apartment complex. Jean-Gilles arrived at the apartment in the black Audi, the officers arrested him on an unrelated warrant, and the officers had the Audi towed and impounded.

The following morning, Detective Evans went to the impound lot to verify the license plate and vehicle identification numbers of the Audi to support an application to search the car. Detective Evans looked through the front windshield and driver's side window of the Audi and saw a cellphone in the driver's seat and

6

marijuana and a plastic bag containing suspected cocaine in the console cupholder. Detective Evans thought that the cellphone potentially belonged to Jean-Gilles because he was driving the Audi before it was impounded, and, when Jean-Gilles was arrested, he did not have a cellphone on his person. It was a "very sunny" morning, and, despite the windows being "somewhat" tinted, Detective Evans testified that he was able to "clearly look inside the vehicle" without "any difficulties."

On July 9, 2018, Detective Evans drafted an affidavit in support of a search warrant for the Audi, based upon its connection to his homicide investigation and his observations of the cellphone and suspected drugs.[5] His affidavit explained that, within 48 hours of the homicide, Evans connected Jean-Gilles to the two vehicles used to facilitate the murder. Evans's thorough affidavit explained the details of the Stockton murder, the investigation, and how the officers found the Honda Accord, Jean-Gilles, and the Audi. Detective Evans wrote that he believed the Audi contained evidence relating to the murder, including fingerprint or DNA evidence, cellphone evidence, marijuana, and cocaine.

At the suppression hearing, Detective Evans also testified that, even without his plain-view observations, he had enough probable cause to execute a search

[5]On the same day, Detective Evans drafted two other warrants to search the Audi, which were largely the same as the first warrant.

warrant on the Audi based on the car's connection to his homicide investigation.

During the search of the Audi, investigators discovered Joseph's latent fingerprints

on the rearview mirror. Officers also discovered an envelope containing a

document referencing the Luma apartments and the name "Wilbert Desir."

Detective Evans included this evidence—the fingerprints and the document

referring to the Luma apartments and Desir—from the Audi in his affidavits in

support of the search warrants of Joseph's apartment and garage.[6]

In those same affidavits, Detective Evans also included: (1) the information

from assistant manager Simmons that Joseph had used the false name of Wilbert

Desir in renting the apartment; and (2) the real Wilbert Desir's interview

statements that he had not rented the Luma apartment. Detective Evans testified

that, independent of the evidence found in the Audi, he would have sought search

warrants for Joseph's apartment and garage based on assistant manager Simmons's

identification of Joseph as a tenant using a false identity and the real Desir's

interview statements that he had not rented the apartment and garage. The

government introduced pictures of the Audi from the front and the driver's side

---

[6]The record is not clear about exactly what type of document was found in the Audi. The apartment warrant affidavit says it was a cashier's check and a statement of the amount of rent owed. At the suppression hearing, Detective Evans testified that it was "like a rental statement." The government's brief says it was a rental agreement. Joseph's motion to suppress calls it "documents related to apartment 5304 in the Luma Apartment Complex." Nonetheless, it is not disputed that the words of the document in the Audi referred to Wilbert Desir and the Luma apartments.

taken on the day of the warrant applications.

At the suppression hearing, defendant Joseph called two witnesses. First, Deborah Alexis testified that she was the record owner of the black Audi sedan. In reality though, the Audi belonged to Joseph, as he purchased it, drove it, possessed all the ownership paperwork, performed all maintenance, and had the only key. Alexis merely put the Audi in her name upon Joseph's request, and she never possessed or drove it without Joseph's consent. Alexis explained that the windows on the Audi were tinted very dark, so "you can't really see through the windows," even in the daylight. The second witness, Jean-Gilles's brother, Jonathan Jean-Gilles, testified that the Audi windows were tinted, and he was unable to see through the Audi's windows on the night that the car was impounded.

Joseph's counsel argued that Detective Evans lied in obtaining the Audi search warrant because the Audi's tinted windows were too dark to see the narcotics. The government responded that Joseph lacked standing to challenge the Audi search because he was not its registered owner, and the homicide investigation was an independent basis to search the Audi.

The district court denied defendant Joseph's motion to suppress. The district court recounted the facts regarding the homicide investigation that led the officers to the black Audi and the document inside referring to the Luma apartments. The district court found that (1) Detective Evans did not make any false statements in

9

the search warrant affidavits, and (2) he "was able to see what he reasonably believed was contraband or evidence of a crime." The district court also concluded that, independent of the plain-view observations of the inside of the Audi, probable cause existed to search the Audi, and probable cause existed to search Joseph's apartment and garage for evidence of identity theft. The district court declined to rule on the question of Joseph's standing to challenge the Audi search.

**B.     Joseph's Motion in Limine**

Before trial, Joseph also filed a motion in limine, under Federal Rule of Evidence 404(b), to exclude evidence of his prior convictions for identity theft and possession and sale of narcotics. The government responded that it did not intend to introduce his prior convictions; however, it would seek the admission of "inextricably intertwined" facts relating to Joseph's use of a false identity to rent the apartment and garage. The government argued that such evidence was not being admitted pursuant to Rule 404(b), but rather as an integral and natural part of how the investigation unfolded and the story of the crime.

The district court granted Joseph's motion in limine to exclude his past criminal convictions. The district court noted that Joseph's motion had not sought exclusion of the factual evidence of Joseph's use of a false identity to rent the apartment and garage—which the government identified as "inextricably intertwined."

10

## III.  TRIAL

At trial, the government presented evidence of the events recounted above through: (1) testimony from various officers and detectives, a fingerprint examiner, two forensic scientists, a prison records custodian, four drug experts, Desir, and assistant manager Simmons; (2) surveillance and dashcam videos; (3) Joseph's rental application and lease; (4) drugs and other items seized from Joseph's apartment and garage; and (5) photographs of the evidence.

### A.    Opening Statement and Evidence Regarding Identity Theft

During opening statements, the prosecutor explained that Joseph rented his apartment using the stolen identity of Wilbert Desir, including his "name, Social Security number, and date of birth."  After the government's opening statement, defense counsel, at a sidebar conference, moved for a mistrial.  Joseph argued that (1) the prosecutor's statements about Joseph's use of a stolen identity violated the district court's order granting the defense's motion in limine, and (2) the facts about Joseph's use of a stolen identity were totally unrelated to the four charged drug crimes and were more prejudicial than probative.  The district court denied the mistrial motion because the evidence was "inextricably intertwined into the drug[] charges."

Later, assistant manager Simmons testified that she dealt directly with residents when receiving their rental applications at the Luma apartments.  The

11

paperwork was kept and maintained in filing cabinets in the ordinary course of business.  The government showed Simmons Joseph's rental application and lease for his apartment and garage.  Defense counsel objected to their admission under Federal Rules of Evidence 403, 404, and 803(6).  The district court overruled the objections and admitted the rental application and lease into evidence.  Simmons testified that Joseph filled out the paperwork in front of her in her office using the name Wilbert Desir, and she began to process the rental application that day.

Next, Wilbert Desir testified, over the defense's objection, that he never filled out a rental application for an apartment in the Luma complex, and he never gave Joseph permission to use his identity.  Joseph moved for a mistrial, which the district court denied.  The district court ruled that Desir's identity-theft testimony was admissible because it was relevant to Joseph's guilty knowledge and showed how the investigation unfolded as to who rented the apartment and the basis for the search.  After Desir's testimony and upon defense counsel's request, the district court gave the jury a limiting instruction about the identity-theft evidence and cautioned the jury that Joseph "[was] on trial only for the specific narcotics crimes charged in the indictment."[7]

---

[7]The district court's limiting instruction cautioned:
Regarding the testimony that you heard yesterday about Mr. Desir, I caution you that the defendant is on trial only for the specific narcotics crimes charged in the indictment.  You're here to determine from the evidence in this case whether the defendant is guilty or not guilty of those specific crimes.

12

A forensic DNA expert, Brandy Plean, testified that DNA evidence collected from the credit card scanner, in a computer bag in Joseph's kitchen, originated from two contributors. It was 87 times more likely that the DNA originated from Joseph and an unknown individual, than from two unknown individuals. Additionally, DNA evidence collected from a laptop, in the same computer bag as the credit card scanner, originated from four contributors. It was two billion times more likely that the DNA originated from Joseph and three unknown individuals, than from four unknown individuals.

## B.    Fentanyl Testimony

Also in the government's case-in-chief, Detective Charles Booth testified that fentanyl is "responsible for the majority of overdose deaths in the recent years," and law enforcement personnel employ extra precautions when handling suspected fentanyl because "it could kill you." At a sidebar conference, defense counsel moved for a mistrial, arguing that Booth's testimony was "highly prejudicial" because the jury might conclude that Joseph was responsible for dealing deadly drugs. The district court denied the motion and stated, "[i]f anybody on that jury doesn't know that heroin and fentanyl are dangerous and responsible for deaths, they've been living under a rock for a long period of time."

Later, a narcotics expert testified—without objection—about the dangers of fentanyl, that the drug was "a hundred times more powerful than heroin," and that

13

officers use extra caution when handling suspected fentanyl because death can result if just a small amount makes contact with a person's skin.

## C.    Outburst of Joseph's Brother

During a break in the government's case-in-chief, some jurors witnessed Joseph's brother yelling in the hallway. While flailing his arms, he screamed, "That's my brother, man, that's my brother." His family had to restrain him. Because Joseph's brother was so emotional and loud, defense counsel requested that the district court ask the jurors if they saw the episode and if it would affect their ability to be fair. Joseph also moved for a mistrial based on the impact he suspected the outburst had on the jurors.

Five jurors indicated that they saw the outburst by Joseph's brother and described his loud, emotional shouting. After being individually questioned by the district court, two jurors stated that seeing the outburst made them "nervous" or "a little shook up." However, all five jurors confirmed they could be fair, put aside what they had seen, and base their verdict solely on the law and the evidence presented in the courtroom.

Outside the presence of the jury, Joseph's counsel reiterated his motion for a mistrial and argued that some of the jurors were "shook up, upset, or frightened." Joseph's counsel acknowledged that all of the jurors stated that they could be fair and impartial. Nevertheless and "in an abundance of caution," Joseph's counsel

14

moved for a mistrial because he believed that the jurors would associate Joseph with his brother's violent nature. The district court denied the motion. After the jury returned to the courtroom, the district court reiterated that the jurors should base their verdict only on the law and evidence and asked them to not discuss anything that may have happened outside of the courtroom.

## D.    Verdict

After the government rested, the defense did not present any evidence. The jury found Joseph guilty on all counts.

## IV.   SENTENCING

Joseph's presentence investigation report ("PSI") assigned him a base offense level of 32 because his offense involved at least 3,000 kilograms but less than 10,000 kilograms of converted drug weight. See U.S.S.G. § 2D1.1(a)(5). The PSI added a two-level increase because Joseph maintained a premises for the purpose of manufacturing or distributing a controlled substance. See U.S.S.G. § 2D1.1(b)(12). Based on a total offense level of 34 and a criminal history category of IV, Joseph's advisory guidelines range was 210 to 262 months' imprisonment. The statutory maximum sentence was life imprisonment for Counts 1 and 2 and 20 years' imprisonment for Counts 3 and 4. See 21 U.S.C § 841(b)(1)(A), (b)(1)(C).

At the sentencing hearing, Joseph, through counsel, conceded that the

15

advisory guidelines range was properly calculated.  Joseph asked the district court to sentence him at the bottom of or below the advisory guidelines range.

The government argued for an upward variance based on the nature and circumstances of the offenses.  The government introduced photographic evidence of identity theft found during the search of Joseph's apartment, which was not introduced at trial.  The images showed a bag full of driver's licenses, credit cards, debit cards, correspondence from credit card companies, and receipts found in Joseph's kitchen.  The government explained that Joseph clearly was engaging in identity theft and tax fraud for many years.  Based on the identity-theft evidence, the government argued that Joseph deserved a more severe sentence than codefendant Marc's 240 months, and it asked the district court to vary upward to 360 months' imprisonment.

Joseph pointed out that the government already had warned it would be bringing additional identity-theft charges against him.  Joseph asserted he should not be punished twice for the same conduct.  He also argued that he should be presumed innocent of a pending firearm charge.  Joseph submitted letters showing that he had supported his family.  In allocution, Joseph maintained his innocence and asked the district court for leniency.

The district court stated that it (1) had considered the advisory guidelines range and the 18 U.S.C. § 3553(a) factors, (2) presumed Joseph was innocent of

16

any other charges, and (3) could consider the evidence of identity theft found during the search of Joseph's apartment, but that it would not "give [the evidence] the weight that the government would like to attach to [it]." The district court denied the government's request for an upward variance but explained that it would consider the government's highlighted factors in choosing a within-guidelines-range sentence. The district court also noted the large quantity of drugs involved and explained that it must impose a sentence that promotes respect for the law and deters others from similar conduct. The district court sentenced Joseph to 262 months' imprisonment on each of Counts 1 and 2 and 240 months' imprisonment on each of Counts 3 and 4, all to run concurrently.

## V.  MOTION TO SUPPRESS

On appeal, Joseph challenges the district court's denial of his motion to suppress.[8]

The Fourth Amendment secures the right of the people "against unreasonable searches and seizures," and mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend.

---

[8]In reviewing a district court's denial of a motion to suppress, we review the district court's findings of fact for clear error and its application of law to those facts de novo. United States v. Yeary, 740 F.3d 569, 579 n.25 (11th Cir. 2014). We construe all facts in the light most favorable to the party that prevailed in the district court and afford substantial deference to a factfinder's credibility determinations. United States v. Lewis, 674 F.3d 1298, 1303 (11th Cir. 2012). We defer to and accept the trial court's choice of whom to believe because it is the finder of fact who personally observes the witness's testimony and is in a better position to assess witness credibility. United States v. Ramirez–Chilel, 289 F.3d 744, 749 (11th Cir. 2002).

IV.  "Probable cause exists when under the totality-of-the-circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  United States v. Albury, 782 F.3d 1285, 1292 (11th Cir. 2015) (alteration in original) (quotation marks omitted).

Here, Joseph argues that Detective Evans lied when he stated in his affidavits that he could see suspected narcotics inside the Audi and that the poisonous fruits of the Audi search formed the basis for the later warrants to search Joseph's apartment and garage.[9]  We recognize that Joseph called two witnesses who testified the windows were tinted very dark.  One witness said, "you can't really see through the windows."  The other witness said that he could not see through the windows on the night the Audi was impounded.  In contrast, Detective Evans testified that he was able to see through the tinted windows in the daylight.

The district court expressly found that Detective Evans did not make any false statements and "was able to see what he reasonably believed was contraband or evidence of a crime."  The witness's credibility was for the fact finder to determine.  See United States v. Ramirez–Chilel, 289 F.3d 744, 749 (11th Cir. 2002).  Because Joseph has shown no clear error in the district court's findings, the

---

[9]The district court did not rule on Fourth Amendment "standing" as to the Audi. "Because Fourth Amendment standing is subsumed under substantive Fourth Amendment doctrine, it is not a jurisdictional question and hence need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim."  Byrd v. United States, 584 U.S. __, __, 138 S. Ct. 1518, 1530 (2018).

district court properly denied Joseph's motion to suppress.[10]

## VI.  MOTIONS FOR MISTRIAL

Joseph next contends that the district court erred by denying three of his

motions for a mistrial, which we address separately.[11]

### A.    Identity-Theft Evidence

Joseph argues that the prosecutor's opening statements—referencing his use

of a false identity to rent the Luma apartment—warranted a mistrial because he

was not charged with an identity-theft crime, and thus this evidence was

inadmissible under Rule 404(b).

Rule 404(b) prohibits the admission of  "[e]vidence of a crime, wrong, or

other act . . . to prove a person's character in order to show that on a particular

occasion the person acted in accordance with the character." Fed. R. Evid. 404(b).

This Court repeatedly has held, however, that evidence of criminal activity other

than the offense charged may be admissible "as intrinsic evidence outside the

---

[10]Joseph also points to a date discrepancy in Detective Evans's affidavits, which Evans explained and clarified on redirect-examination during the suppression hearing.  Detective Evans testified that agents encountered and seized the Audi as they were surveilling Jean-Gilles's apartment on July 8.  But the affidavits said that the surveillance occurred on Sunday the 9th. Evans acknowledged the error in the affidavits, explained that Sunday was the 8th, and confirmed he saw the cellphone and suspected drugs the next morning (July 9) at the impound lot and not on the night of the seizure.

[11]We review for abuse of discretion the denial of a motion for a mistrial.  United States v. Valois, 915 F.3d 717, 723 n.2 (11th Cir. 2019).  "A trial judge has discretion to grant a mistrial since he [or she] is in the best position to evaluate the prejudicial effect of a statement or evidence on the jury."  United States v. Delgado, 321 F.3d 1338, 1346-47 (11th Cir. 2003) (alteration in original) (quotation marks omitted).

19

scope of Rule 404(b)." United States v. Horner, 853 F.3d 1201, 1214-15 (11th Cir. 2017) (quotation marks omitted).  Evidence is intrinsic if it is "(1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense." United States v. Edouard, 485 F.3d 1324, 1344 (11th Cir. 2007) (quotation marks omitted);  United States v. Jiminez, 224 F.3d 1243, 1249 (11th Cir. 2000) (quotation marks omitted).  Evidence is "inextricably intertwined" with the evidence of the charged offense if it forms an "integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted."  Edouard, 485 F.3d at 1344 (quotation marks omitted).

Here, Joseph's use of Desir's false identity to rent the property in which he stored the narcotics was inextricably intertwined with the narcotics offenses and was not inadmissible under Rule 404(b).  That evidence established that Joseph, not Desir, leased the property and exercised dominion and control over the drugs. The use of a false identity was also (1) relevant as a step Joseph took to conceal the criminal activity, and (2) necessary to complete the story of how officers discovered Joseph was renting the apartment and garage.  Further, the district court gave a limiting instruction about the identity-theft evidence: that Joseph "[was] on trial only for the specific narcotics crimes charged in the indictment."

20

Because the details of Joseph's impersonation of Desir were properly admitted at trial, there was no error in the prosecutor's opening remarks referencing that evidence or in the district court's denial of Joseph's mistrial motion.

## B.    Booth's Testimony About Fentanyl

Joseph argues that Detective Booth's testimony about the dangers of and overdoses from fentanyl was inadmissible under Rule 403 because it was "shocking" and had low probative value.  Rule 403 permits a district court to "exclude relevant evidence if its probative value is substantially outweighed by the danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.[12]

Here, Detective Booth's testimony about his familiarity with fentanyl was relevant and probative because Joseph was charged with a crime involving fentanyl.  The district court reasonably observed that the general public already is aware that heroin and fentanyl can be deadly.  Given that reality, Joseph could not show unfair prejudice, let alone that any such prejudice outweighed the evidence's

---

[12]We review evidentiary rulings for an abuse of discretion.  United States v. Troya, 733 F.3d 1125, 1131 (11th Cir. 2013).  If the district court abused its discretion, we apply the harmless error standard and may reverse only if "the error had a substantial influence on the outcome of a case or left grave doubt as to whether [it] affected the outcome of a case."  United States v. Henderson, 409 F.3d 1293, 1300 (11th Cir. 2005) (alterations adopted) (quotation marks omitted).

probative value.[13]  The district court did not abuse its discretion by admitting the fentanyl evidence and denying a mistrial.

## C.    Outburst During Trial

Joseph also argues that his brother's outburst negatively impacted the jury's impression of Joseph himself, requiring a mistrial.  Two of the five jurors who witnessed Joseph's brother's outburst said that it made them "nervous" or "a little shook up."  However, all five of the jurors indicated that they could be fair and that the outburst would not affect their verdict.  Further, the district court reiterated that the jurors should base their verdict only on the law and evidence admitted at trial and asked them not to discuss the outburst.  See United States v. Delgado, 321 F.3d 1338, 1347 (11th Cir. 2003); United States v. Almanzar, 634 F.3d 1214, 1222 (11th Cir. 2011) ("We presume that jurors follow the instructions given by the district court.").  The district court was in the best position to evaluate the prejudicial effect, if any, of the outburst and acted well within its broad discretion in denying the mistrial motion.  Joseph has not shown that the district court abused its discretion.

---

[13]A narcotics expert testified that fentanyl is "a hundred times more powerful than heroin" and that coming into contact with a small amount of fentanyl can cause death, to which Joseph did not object.  The fact that similar evidence was admitted through another witness, without any objection or mistrial motion, further indicates a lack of unfair prejudice.

## VII.    EVIDENTIARY ISSUES

### A.    DNA Testimony

Joseph argues that the district court erred by permitting the government's DNA expert to testify that Joseph's DNA was matched to DNA found on a laptop and credit card scanner discovered in a computer bag in his apartment. He argues that the DNA evidence erroneously revealed to the jury that Joseph engaged in identity theft. Joseph ignores that no trial testimony or evidence revealed the contents of the laptop or the credit card scanner or that either contained evidence of stolen identities. Rather, the DNA evidence was intrinsic and properly served to connect Joseph to the apartment and the charged offenses. See Edouard, 485 F.3d at 1344. Accordingly, the district court did not abuse its discretion by admitting the DNA testimony.[14]

### B.    Rental Application and Lease

Next, Joseph contends that the admission of his rental application and lease was inadmissible hearsay that did not qualify under the business record exception in Rule 803(6) because the testifying witness was not the record custodian for the business.

Generally, a statement is inadmissible hearsay if it was made outside of

---

[14]It is unclear whether defense counsel adequately raised this objection in the district court. We need not decide whether plain error review applies because there was no abuse of discretion in any event.

court and is offered to prove "the truth of the matter asserted." Fed. R. Evid. 801(c), 802. Rule 803(6) provides an exception to the rule against hearsay for a record made at or near the time of an act by a person with knowledge if the record "was kept in the course of regularly conducted activity of a business" and "making the record was a regular practice of that activity." Fed. R. Evid. 803(6)(A)-(C). A proponent may establish the requirements of Rule 803(6) through "the testimony of the custodian or another qualified witness." Fed. R. Evid. 803(6)(D). "The touchstone of admissibility under [Rule 803(6)] is reliability, and a trial judge has broad discretion to determine the admissibility of such evidence . . . ." United States v. Bueno–Sierra, 99 F.3d 375, 378-79 (11th Cir. 1996).

Here, assistant manager Simmons testified that the Luma apartments' business practice was to maintain lease documents that it received and processed. See Fed. R. Evid. 803(6). At a minimum, Simmons was a "qualified witness" because she: (1) was an assistant manager at the Luma apartments; (2) was familiar with the business's creation and maintenance of lease records; (3) accepted rental applications daily and kept them in a filing cabinet in the ordinary course of business; and (4) provided first-hand knowledge that Joseph filled out a rental application—containing Desir's name, social security number, and date of birth—in her office and submitted it to her directly for processing. See id. Joseph has not shown that Simmons's testimony was otherwise unreliable. See Bueno–Sierra, 99

24

F.3d at 378-79.  The district court clearly did not abuse its discretion in admitting the rental application and lease under Rule 803(6).[15]

## VIII.  CUMULATIVE ERROR

Joseph also contends that cumulative error by the district court requires reversal of his convictions.  Joseph has not established a single error, let alone the aggregation of many errors.  See United States v. Gamory, 635 F.3d 480, 497 (11th Cir. 2011).  Joseph's cumulative error claim therefore lacks merit.

## IX.  SENTENCES

On appeal, Joseph challenges only the substantive reasonableness of his sentences.[16]  We examine whether a sentence is substantively unreasonable in light of the § 3553(a) factors and the totality of the circumstances.[17]  United States v. Cubero, 754 F.3d 888, 892 (11th Cir. 2014).  The party challenging the sentence

---

[15]To the extent Joseph claims these documents were not admissible under Rule 404(b) because they showed he used the false identity of Wilber Desir, those documents were intrinsic evidence (1) connecting Joseph to possessing the apartment and garage, and the drugs therein; (2) telling part of the story as to why the officers searched the apartment and garage; and (3) revealing steps Joseph took to hide his criminal activity.  There was no Rule 404(b) error.

[16]We review the substantive reasonableness of a sentence for abuse of discretion.  See United States v. Rosales–Bruno, 789 F.3d 1249, 1254 (11th Cir. 2015).

[17]The § 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to victims.  18 U.S.C. § 3553(a).

bears the burden to show it is unreasonable.  United States v. Alvarado, 808 F.3d 474, 496 (11th Cir. 2015).  The weight given to any particular § 3553(a) factor is within the district court's discretion, and this Court will not substitute its judgment for that of the district court.  Id.  We will reverse a sentence only if we are "left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case."  United States v. Pugh, 515 F.3d 1179, 1191 (11th Cir. 2008) (quotation marks omitted).  Although this Court does not automatically presume a sentence falling within the advisory guidelines range is reasonable, we ordinarily expect such a sentence to be reasonable.  United States v. Hunt, 526 F.3d 739, 746 (11th Cir. 2008).

Here, Joseph does not dispute that the district court properly calculated his advisory guidelines range.  Rather, Joseph contends that the sentences were substantively unreasonable because the district court considered an unrelated charge of firearm possession and relied on the identity-theft evidence.  We disagree.

First, the district court said it would presume Joseph innocent of the pending firearm charge.  Second, the district court declined the government's request for an upward variance based on the identity-theft evidence and stated that it was not giving that evidence "the weight that the government would like to attach to [it]."

26

Third, the district court explained that the top-of-the-guidelines range sentence was based on the large quantity of drugs attributed to Joseph and the consideration of the need to promote respect for the law and deter others from similar criminal conduct. See 18 U.S.C. § 3553(a). To the extent that the district court gave any weight to the identity-theft evidence, the district court was permitted to do so under a consideration of the nature and circumstances of the offenses, and the weight given to that factor was well within the district court's discretion. See 18 U.S.C. § 3553(a); Alvarado, 808 F.3d at 496.

Fourth, Joseph's 262-month sentences on Counts 1 and 2 are within the advisory guidelines range and well below the statutory maximum penalty of life imprisonment, both of which are indicators of reasonableness. See Hunt, 526 F.3d at 746; United States v. Gonzalez, 550 F.3d 1319, 1324 (11th Cir. 2008). His 240-month sentences on Counts 3 and 4 are also appropriate because the Sentencing Guidelines reduced his top-end of 262 months to the statutory maximum of 240 months for those two counts. See U.S.S.G. § 5G1.1(c)(1) (restricting the top end of a guidelines range to the statutory maximum). The district court did not abuse its discretion in imposing Joseph's sentences.

## X.  CONCLUSION

For all of the foregoing reasons, we affirm Joseph's convictions and

27

28

sentences.

**AFFIRMED.**