**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 24-13110

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

HENRY GUICE, JR.,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 2:23-cr-00379-RAH-SMD-1

_____

Before JORDAN, BRANCH, and KIDD, Circuit Judges.

PER CURIAM:

Henry Guice, Jr., appeals his drug-related convictions, arguing that the district court erred in denying his motion to suppress the self-incriminating statements that he made to law

enforcement without being advised of his rights under *Garrity v. New Jersey*, 385 U.S. 493 (1967).  After review, we affirm.

## I.    Background

A federal grand jury indicted Guice on one count of conspiracy to distribute methamphetamine in violation of 21 U.S.C. § 846 and one count of possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1). Thereafter, Guice filed a motion to suppress the self-incriminating statements he previously made to police.  He argued that, as a public employee of the Alabama Department of Corrections ("ADOC") when the drugs were discovered, an ADOC administrative policy required him to cooperate with the underlying investigation or risk facing discipline, including possible termination of employment, and the police failed to inform him that as a public employee he had a right against self-incrimination under *Garrity*.  Accordingly, he maintained that his statements were coerced and involuntary.

Following the government's response, a magistrate judge held an evidentiary hearing on the motion.  Guice called W.D. Favor, an investigator with the law enforcement service division of the ADOC, as a witness who testified to the following.  Favor's division investigated criminal activity within the ADOC, while the separate Inspector General's Office division handled administrative investigations or discipline cases.  On June 20, 2023, a K-9 unit at Alabama's Staton Correctional Facility notified Favor that a dog had "made a hit" on Correctional Officer Guice's car in the prison's

parking lot.  A search of the car revealed narcotics and drugs were also found on Guice's person.  Guice was placed in handcuffs and transported to Favor's office for questioning.[1]  Upon arrival at Favor's office, Favor removed the handcuffs and read Guice his *Miranda*[2] rights, and Guice signed the form waiving his *Miranda* rights.  Favor explained that he never told Guice that he had to speak with him.

Favor testified that, at the time of the investigation, he was generally familiar with ADOC regulations that governed ADOC employees like Guice.  Administrative Regulation 208, in relevant part, provided that "[a]ll ADOC employees shall adhere to the following standards," including "[c]ooperate with investigations to include, but not limited to, providing information or verbal/written statements in connection with employment, investigation, or incident reports."  And ADOC policy further provided that if an employee violated the regulations, the employee "could be subject to [various] levels of discipline, from a warning all the way up to dismissal."  The Commissioner of ADOC had the ultimate discretion to determine the appropriate punishment for a violation of ADOC policy, procedures, and regulations.  Favor maintained that because his investigation was criminal, not an internal administrative investigation, Regulation 208 did not apply and Guice could have opted not to make a

---

[1] Favor explained that the law enforcement division's office was separate from the prison grounds and was located "about a quarter mile away."

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

statement without ADOC punishment.  Nevertheless, he admitted that "theoretically" "any violation" of ADOC policy "could result in [an] employee's dismissal."

Favor admitted that he was aware of a waiver of rights form based on *Garrity* that was similar to the *Miranda* waiver form, but he had never used that form in his almost 30 years of service because he never worked on internal or administrative investigations.  He reiterated that he did not give Guice the *Garrity* form because Favor did not "work in the inspector general's office" and his investigation was criminal not administrative.  Favor confirmed that his colleague Agent Charday Jackson was also present for Guice's interrogation.

The government then introduced audio recordings of Guice's interviews and played them for the court.  At the beginning of the interview, Agent Favor stated that the "case charge" was promoting prison contraband in the second degree and possession of methamphetamine, and Favor orally reviewed Guice's *Miranda* rights.  Favor explained that it was completely up to Guice if he decided to speak with Favor and that Guice could cease answering questions at any time.  Guice indicated that he understood and executed the waiver.  Initially, Guice denied knowing how the drugs got into his vehicle.  After detailing his movements for the previous 24 hours, Guice asked, "If I resign, I ain't going to be fired?"  Favor responded, "that is something totally different from what I do, but yes, you can resign."  When Guice expressed frustration with the interview and that he did not want to answer

any more questions, Favor reiterated that Guice could stop answering questions at any time and that Guice had the right not to talk to Favor. Favor then explained that "this [was] going to go to court" regardless and that Guice was "going to jail today." Guice responded that he thought he would get a chance to resign first, and Favor explained that Guice's resignation had "nothing to do with the criminal part." Favor stated that Guice's employment had "nothing to do" with Favor and that Favor was a police officer. Favor reiterated that he had "nothing to do with the admin side of things," that his job concerned "the criminal side of things," and that he was there to talk about the two felonies that Guice was facing. Guice indicated that he wanted to stop the interview, and Favor complied. Favor testified that he left the room to complete paperwork and about 15 minutes later, Agent Jackson informed him that Guice wanted to talk.

Agent Jackson testified that, after Guice terminated the first interview and exited the room, Guice asked her "what the process was." She informed Guice that Agent Favor was securing warrants and that Guice would be transported to the county jail based on those warrants. Guice again asked her "about the process of him resigning," and she reiterated "what Agent Favor had already said . . . about the criminal aspect versus the administrative aspect and [she and Agent Favor] were only solely concerned with the criminal investigation and that the administrative investigation would be conducted by investigators from the office of the inspector general." In response, Guice "hung his head" and expressed concern with his arrest being aired on the news and

upsetting his mother who was ill. Guice then expressed that he had just been trying to take care of his ill mother, at which point, Agent Jackson advised him that if he wished to continue talking and wanted to make a statement, she would need to get Agent Favor. Guice indicated that he wished to make a statement, and Agent Jackson notified Favor, and they initiated the second interview.

At the beginning of the second interview, Guice confirmed that he wanted to talk and that the agents were not forcing him to do so. Guice then made incriminating statements in which he admitted to bringing drugs into the prison for an inmate known as "Country" in exchange for money for the past several months.

Favor explained that, at the end of the second interview, the prison's assistant warden, Warden McKee, asked to speak with Guice. After speaking with Guice, Warden McKee informed Agent Favor that Guice had resigned. Favor then resumed the interview by showing Guice a photographic lineup and seeing if he could pick out the inmate with whom he had been working. Guice then identified the inmate.

Finally, Guice testified that he resigned only after making incriminating statements to Agent Favor. Guice stated that, at the time of his interview, it was his understanding that, if an employee refused to participate in an investigation, the employee could be fired. Furthermore, he stated that Favor and Jackson's status as ADOC employees influenced his decision to make a statement.

On cross-examination, Guice admitted that he was handcuffed and that he understood being handcuffed was

associated with a crime.  Even though Guice acknowledged that Agent Favor explained to him that Guice could resign but that his resignation had nothing to do with the pending criminal matter, Guice testified that he still thought that the criminal investigation and the administrative investigation were "the same" because Favor was "ADOC" and "an investigation is an investigation." When Agent Favor explained that his job was "to find out what happened in the criminal side of things," Guice denied understanding this statement to mean that Agent Favor's job was criminal and "not the admin side of things."  Instead, Guice stated "[i]t's all ADOC."  Guice reiterated that it was his understanding that, based on Regulation 208, he had to participate, and if he did not, he would be fired.  He confirmed that he feared losing his job at the time he made the statements.

Following the hearing, the magistrate judge issued a report and recommendation ("R&R"), recommending the denial of Guice's motion to suppress.  Citing *United States v. Smith*, 821 F.3d 1293 (11th Cir. 2016), the magistrate judge concluded that, where, as here, there was not a direct threat of termination, "statements are protected under *Garrity* only when (1) the employee in fact believed that he would be fired unless he gave the statement, and (2) the employee's subjective belief that he would be fired was objectively reasonable under all of the circumstances."  The magistrate judge concluded that Guice failed to establish either element.  First, the magistrate judge concluded that, in *Smith*, we determined that Regulation 208, which was entirely speculative about the possibility of termination, was insufficient to trigger

*Garrity* protection.    Second, with regard to whether Guice possessed the necessary subjective belief that he would be terminated unless he cooperated, the magistrate judge determined that Guice's "testimony at the hearing was not credible."  The magistrate judge noted that his testimony—that he thought the regulation required him to participate and that if he refused he could be fired—was "inconsistent" with statements he made in the interview "and seemed rehearsed."  Furthermore, at no point in the interview did Guice mention this regulation or his alleged belief that he was required to participate or else be fired.  Rather, the magistrate judge noted that Guice mentioned his employment twice during the interviews and "seemed eager to resign"—"[h]e never mentioned any desire or expectation to keep his job." Accordingly, the magistrate judge deemed Guice's testimony as to his subjective belief unbelievable.

Moreover, the magistrate judge concluded that, even assuming Guice's testimony was believable, it was not objectively reasonable under the circumstances for Guice to believe he would be fired unless he gave a statement.  In support of this conclusion, the magistrate judge cited the following facts: (1) Guice had already given the assistant warden his resignation when he gave the incriminating statement; (2) Agent Favor repeatedly informed Guice that Favor was conducting a criminal investigation that had nothing to do with his employment and that Guice had a right to refuse to participate, which Guice invoked at least once without mention of any employment repercussions; and (3) nothing in the text of the regulation "compels an ADOC employee to give a

statement in a criminal investigation or be fired." Finally, the magistrate judge rejected Guice's contention that *McKathan v. United States*, 969 F.3d 1213 (11th Cir. 2020), demonstrated that his statement was compelled in violation of *Garrity*. Accordingly, the magistrate judge concluded that Guice's statement was not coerced and recommended denial of the motion to suppress.

Guice objected to the R&R, arguing that the magistrate judge (1) clearly erred in concluding that Guice had resigned prior to giving his incriminating statement as the record clearly demonstrated the opposite; (2) misinterpreted the holding in *Smith*; and (3) erred in concluding that *McKathan* did not apply. The district court summarily overruled Guice's objections and adopted the R&R denying the motion to suppress.

Thereafter, Guice entered a conditional plea of guilty to both counts, reserving his right to appeal the denial of his motion to suppress. The district court sentenced Guice to a total of 75 months' imprisonment to be followed by 60 months of supervised release. This appeal followed.

## II.     Discussion

Guice argues that the district court erred in denying his motion to suppress because his incriminating statements were clearly compelled and made under threat of job-related sanctions in violation of the Fifth Amendment and *Garrity*. He also maintains that the district court's *Garrity* analysis was flawed for several reasons and that the court improperly discredited his testimony without justification.

"A district court's ruling on a motion to suppress presents a mixed question of law and fact. We review the district court's findings of fact for clear error and its application of the law to the facts *de novo*." *United States v. Lopez-Garcia*, 565 F.3d 1306, 1312–13 (11th Cir. 2009) (quotations and citation omitted). "[W]here there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous." *Smith*, 821 F.3d at 1302 (quotations omitted).

Additionally, "[c]redibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002). Thus, we must defer to the district court's credibility determination "unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it." *Id.* (quotations omitted).

The Fifth Amendment provides, in relevant part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Generally, the Fifth Amendment privilege against self-incrimination "is not self-executing," and a person must specifically assert the right. *United States v. Vangates*, 287 F.3d 1315, 1320 (11th Cir. 2002). "An exception to this rule arises when assertion of the Fifth Amendment privilege is penalized so as to foreclose a free choice to remain silent and compel incriminating testimony." *Id.*

(quotations omitted). For instance, in *Garrity v. New Jersey*, state police officers who were the subject of an investigation by the Attorney General were told that "anything [they] said might be used against [them] in any state criminal proceeding" and that they could exercise their Fifth Amendment right and not answer the questions if doing so would tend to incriminate them, but should they invoke the privilege and decline to answer, their employment would be terminated. 385 U.S. 493, 494 (1967). The Supreme Court held that, when public employees are given the choice of either forfeiting their jobs or incriminating themselves, the Fifth Amendment has been violated because a choice of that kind is "'likely to exert such pressure upon an individual as to disable him from making a free and rational choice.'" 385 U.S. 493, 497 (1967) (quoting *Miranda*, 384 U.S. at 464–65). Accordingly, "a public employee may not be coerced into surrendering his Fifth Amendment privilege by threat of being fired or subjected to other sanctions." *Vangates*, 287 F.3d at 1320. And such compelled statements cannot be used in any criminal proceeding or prosecution. *See Garrity*, 385 U.S. at 499–500.

When, as here, there is no outright direct threat of job loss, "we determine whether the [public employee's] statements were compelled by examining [his] belief and, more importantly, the objective circumstances surrounding it." *Vangates*, 287 F.3d at 1321–22. First, we must examine whether the defendant "subjectively believed that he was compelled to give a statement upon threat of loss of job." *Id*. at 1322 (quotations omitted). "Second, this belief must have been objectively reasonable at the

time the statement was made." *Id.* (emphasis omitted) (quotations omitted). In determining whether the belief was objectively reasonable, we must examine "the totality of the circumstances surrounding the [allegedly compelled statement]." *Id.*

In *Smith*, we considered a similar claim to Guice's. In that case, Smith, an ADOC employee, filed incident reports with falsified information following his beating of an inmate. 821 F.3d at 1297–98. He moved to suppress these statements in the incident reports on the basis that they were compelled under *Garrity* because (1) ADOC regulations required employees to complete a report of any unusual incidents that occur during a shift and to cooperate with investigations, and (2) failure to comply with those regulations triggered potential progressive disciplinary action. 821 F.3d at 1302. We reiterated that "where there is no direct threat, the mere possibility of future discipline is not enough to trigger *Garrity* protection,"[3] and we determined that Smith failed to

---

[3] The district court relied on this language in *Smith* and noted in passing that "[t]his holding effectively ends the analysis here." Homing in on this isolated statement, Guice argues that the district court misinterpreted *Smith* as holding that policies like Regulation 208 can never support *Garrity* protection, and he urges us to reverse on that basis. However, any error in the district court's interpretation of *Smith* was harmless because in the very next sentence, the district court went on to explain that even though it believed that *Smith* foreclosed Guice's claim, it "[n]evertheless . . . address[ed] the two elements of the *Garrity* standard," and it determined that Guice failed to satisfy the *Garrity* standard and denied Guice's claim on the merits. Thus, any error was harmless and did not affect the outcome. Consequently, this alleged error does not serve as a basis for reversal. *See* Fed. R. Crim. P. 52(a) ("Any error,

establish either that he had a subjective belief of termination, or that such a belief would have been objectively reasonable under the circumstances. *Id.* at 1303. Accordingly, we held that Smith's statements in the incident reports were not compelled within the meaning of *Garrity*. *Id.*

As in *Smith*, Guice cannot show that his statements to Agent Favor were compelled within the meaning of *Garrity*. Applying the two-step approach set forth for non-direct threats, the district court first found not credible Guice's testimony that he subjectively believed that he would be fired for failing to answer Agent Favor's questions. And we must defer to this credibility determination because Guice has not shown that it was "contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it."[4] *See Ramirez-Chilel*, 289 F.3d at 749; *United States v. Joseph*, 978 F.3d 1251, 1262 n.8 (11th Cir.

---

defect, irregularity, or variance that does not affect substantial rights must be disregarded.").

[4] Guice challenges the credibility determination, but his arguments ignore that we must defer to the district court's credibility determination "unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it." *Ramirez-Chilel*, 289 F.3d at 749. He does not argue that the district court's determination that he was not credible meets this exceedingly high bar. Instead, he merely quarrels with the court's view of his testimony and the weight it placed on certain facts. Accordingly, he cannot overcome the deference owed to the district court's credibility determination. *See United States v. McPhee*, 336 F.3d 1269, 1275 (11th Cir. 2003) ("As long as the district court's findings are plausible, we may not reverse the district court even if we would have decided the case differently." (quotations omitted)).

2020) ("We defer to and accept the trial court's choice of whom to believe because it is the finder of fact who personally observes the witness's testimony and is in a better position to assess witness credibility."). And absent a subjective belief that he would be fired if he did not answer Agent Favor's questions, Guice's *Garrity* claim necessarily fails. *See Vangates*, 287 F.3d at 1322.

Furthermore, even assuming arguendo that we were to credit Guice's subjective belief, as the district court concluded, his belief was not objectively reasonable under the circumstances.[5] First, after the discovery of the drugs, Guice was handcuffed and taken to Agent Favor's office at ADOC's law enforcement building (which was not located on prison grounds)—these facts were objective indicators that the matter was criminal in nature and not related to Guice's employment. Second, at the start of the interview, Agent Favor informed Guice of the "charges" that he was facing and advised Guice of his *Miranda* rights, which were additional indicators that the matter was criminal and had nothing

---

[5] Guice makes much of the fact that, in determining that his subjective belief was not objectively reasonable, the district court erroneously stated that Guice had already submitted a resignation letter when he gave his incriminating statement. We agree that this factual finding was clearly erroneous as the record establishes that Guice did not resign until after he made the incriminating statement. Nevertheless, this factual error is not a basis for reversal because the district court did not base its entire holding on this fact. Instead, the district court independently determined that Guice's subjective belief that he would be fired if he did not cooperate was not objectively reasonable under the circumstances. And that holding provides an independent, sufficient basis for denying relief.

to do with Guice's employment.  Third, at no point during the interviews, did Agent Favor tell Guice that he had to speak with him.  Fourth, Agent Favor informed Guice multiple times that he did not have to answer questions; that Agent Favor's investigation was criminal and not related to the "admin side of things"; that Guice was "going to jail"; and that Guice's resignation had "nothing to do" with Agent Favor.  Finally, Agent Favor ceased the first interview after Guice stated that he no longer wanted to speak without mentioning anything about Guice's job or indicating that Guice would face any form of discipline for failing to cooperate with the interview.  Thus, under the totality of the circumstances in this case, it was not objectively reasonable for Guice to believe that he would be fired or otherwise disciplined if he failed to cooperate with Agent Favor's investigation.[6]  *See Vangates*, 287 F.3d

---

[6] To the extent that Guice argues that *McKathan* dictates a finding that his statements were compelled because he faced a classic penalty situation, we disagree.  *McKathan* involved a claim of ineffective assistance of counsel in a 28 U.S.C. § 2255 proceeding based on counsel's failure to challenge the admissibility of certain statements McKathan made to his probation officer as being compelled in violation of the Fifth Amendment.  969 F.3d at 1218, 1220–21.  Specifically, McKathan argued that his incriminating admissions to his probation officer were compelled due to the supervised release conditions which required him to truthfully answer all questions by his probation officer.  *Id.*  We concluded that McKathan faced a "classic penalty situation" because the probation officer told him that "if he did not follow the conditions of his supervised release," his release would be revoked and he would go back to prison, which McKathan explained that he subjectively understood to mean that if he did not answer the probation officer's questions, his supervised release would be revoked.  *Id.* at 1228–29 (quotations omitted).  Thus, because McKathan's incriminating statements were made in a classic penalty situation,

16                    Opinion of the Court                    24-13110

at 1322–24.  Accordingly, Guice's statements were not protected by *Garrity*, and the district court properly denied the motion to suppress.

**AFFIRMED.**

---

we held that the government could not use those statements against him in a subsequent criminal prosecution.  *Id*. at 1229.  Accordingly, we concluded that there was a reasonable likelihood that a motion to suppress would have been successful had counsel raised a Fifth Amendment challenge.  *Id*. at 1231. Guice's case is distinguishable from *McKathan* for the reasons discussed above—Guice was never threatened with job-related sanctions for failing to answer Agent Favor's questions and the totality of the circumstances made clear that the matter being investigated was criminal, that Guice's employment had nothing to do with Agent Favor or the criminal investigation, and that Guice had the right to stop answering questions at any time without any negative consequences.  Accordingly, unlike McKathan, Guice did not face a classic penalty situation.